Argued September 15; reversed October 25, 1938

# LOSEY *v.* O'HAIR ET AL.

(83 P. (2d) 493)

64

*R. W. Skopil* and *Custer E. Ross*, both of Salem (R. W. Skopil and Ross & Ford, all of Salem, on the brief), for appellants.

*W. C. Winslow*, of Salem, for respondent.

BAILEY, J.  Plaintiff instituted this suit against Keith O'Hair, administrator of the estate of Stafford Barber, deceased, and Gertrude McGregor and her husband, for a decree declaring plaintiff to be the owner and entitled to the immediate possession of a tract of land in Marion county owned by Stafford Barber at the time of his death.  From a decree in favor of the plaintiff the defendants have appealed.

The complaint alleges that Stafford Barber died in Marion county, Oregon, January 7, 1937, and that Keith O'Hair is the duly appointed, qualified and acting administrator of his estate.  After alleging that Gertrude McGregor and John Doe McGregor are wife and husband, yet without setting forth their relationship to Stafford Barber or indicating what interest they may have in his estate, the complaint thus proceeds:

"That on or about the 25th day of January, 1934, plaintiff and the said Stafford Barber during his lifetime made and entered into an agreement by the terms of which it was mutually understood and agreed by and between plaintiff and said Stafford Barber that the said plaintiff herein would take care of the said Stafford Barber, do his household work as he might direct, including cooking as he might direct, and care for him in sickness as well as in health as he might direct, all until his death, and upon such death make arrangements for and see to it that he, the said Stafford Barber, should and did have a decent burial.  That in consideration thereof the said Stafford Barber agreed

to convey to the plaintiff the following described real property, to-wit [setting forth by metes and bounds real property consisting of approximately seventeen acres, the same property that is involved in this case]."

It is then alleged that the plaintiff thereafter, in pursuance of the agreement, "duly and fully performed all the terms and obligations of said contract upon her part to be kept and performed during the entire lifetime of the said Stafford Barber, and upon his death continued to perform said contract by making arrangements for a decent funeral for said decedent, all in accordance with the instructions of said Stafford Barber during his lifetime."

The complaint further alleges that Stafford Barber after entering into the contract with the plaintiff "did make and execute a conveyance conveying said property to plaintiff herein and intended to deliver the same to the Bank of Woodburn so that plaintiff could obtain the same upon his said death; but that said deed can not now be found."

The last paragraph of the complaint contains an allegation that the decedent Stafford Barber left other and personal property which is more than sufficient to pay all outstanding obligations and debts of the said decedent, together with all costs of administration.

The allegations as to the making of a contract by the decedent and the performance thereof by the plaintiff are denied by the amended answer, and it is therein affirmatively alleged that Stafford Barber did in his lifetime employ the plaintiff from time to time to render certain services for him and that she had been paid in full for said services. All the affirmative allegations are denied by the reply, except as alleged in plaintiff's complaint.

Gertrude McGregor, one of the defendants named in the complaint, is the only child of the decedent, by his first wife, and is his only heir at law. At the time of the trial she was 42 years of age. She was born in Wisconsin, where her parents then resided, and when she was one year old her mother died, whereupon she was sent to live with her grandparents. When she was about seven or eight years of age her father, Stafford Barber, came west and apparently did not thereafter see her.

After arriving in Oregon, Barber married again and settled on a small ranch at Broadacres, near Hubbard, which is the real property here involved and on which he lived some eighteen years. No issue was born to the second marriage. Barber's second wife died in 1933 and he thereafter lived alone in the four-room house on his seventeen-acre tract of land until his death in January, 1937.

In the early part of November, 1933, Barber asked Miss Losey's father and her brother to assist him in butchering two hogs which he owned, and asked Miss Losey to come with them and prepare meals. The three Loseys, who lived about one mile distant, went to Barber's home, and while the men were busy Miss Losey scrubbed the floors, made Barber's bed and prepared the dinner. Barber was very much pleased with what she did for him and thereupon made arrangements for her to come on Thursday of each week when she was not otherwise engaged, to help about the house. She was paid one dollar for each day's work, which as a witness she termed ample compensation for what she did. This arrangement continued for several months.

When the plaintiff visited Barber shortly after Christmas, 1933, she found that he had been ill two or

three days and had eaten very little food. She prepared chicken soup, a cake and other food that he was able to eat. During his illness the plaintiff went to his home three successive days and attended to his needs. The decedent seemed very well pleased with her ministrations. About a month after Barber's illness, on January 25, 1934, the contract which the plaintiff is here seeking to enforce was entered into between the decedent and the plaintiff, according to her evidence. In this connection she testified as follows:

"We had lunch, and he always liked to visit after we had finished dinner. We often spent from three-quarters of an hour to an hour at the dinner table after we had finished, and he said that 'I have a proposition to offer you. You don't have to take it if you don't want to.' And he said, 'I would like to ask you,' that at his death to see that he had a good, decent burial, nothing elaborate, just so that he would be laid away decently. He also said that he would like to have me continue to go there as long as he lived and do whatever he wanted me to do, and also that if he took sick I was to go any time of day or night when he sent for me, and if I would do those three things he would deed me the place. Then I promised him that I would do that for him."

The plaintiff elaborated upon the understanding between herself and Stafford as follows:

"Well, he told me if he got sick I was to go and take care of him. I told him I wasn't a nurse but he said if there was anything I couldn't do and if I had to be up with him day and night he would hire some one to help, but I was to be there all the time."

Miss Losey further testified that on Thursday of each week, from the date of the contract until the death of Barber, she went to his home, arriving there about nine o'clock in the morning and leaving at five or five-

thirty in the afternoon. It was not until plaintiff was cross-examined that the fact was brought out that during the pear-canning season in the fall she would be employed seven or eight weeks continuously in a cannery and during that time she did not make her weekly calls at the decedent's home. In the early summer also, during the cherry-canning season, she was sometimes engaged in cannery work and did not render the decedent any services while so employed. The work she performed for the decedent after the alleged making of the contract was not different from the services she had theretofore rendered him, and she continued to receive the same compensation of one dollar per day.

From all the evidence in the case, it appears that the decedent, who at the time of making the contract was 66 years of age, was very fond of the plaintiff and was well pleased with her services. The record is not clear as to plaintiff's age, which, from circumstances disclosed by the evidence, we understand to have been under 20 years. Barber apparently was lonesome, liked to visit with whomever he saw and especially enjoyed talking with the plaintiff, describing to her the experiences he had had as a timber cruiser and exhibiting to her many maps of timber which he had cruised.

Barber died suddenly on January 7, 1937, while returning to his house from the mail box. He had apparently not been ailing, however, since his illness of 1933. There is a sharp dispute in the testimony as to what Miss Losey did in arranging for the funeral and burial of the decedent. She testified that she handled the matter of procuring the casket and personally made all the funeral and burial arrangements. The mortician, Keith O'Hair, who is also the administrator

of the estate, and Albert Hovenden, a brother of the decedent's second wife, testified that although Miss Losey was present at the mortuary when the arrangements were made, the directions for the funeral were not given by her but by Albert Hovenden. Ed Hovenden, another brother-in-law of the decedent, said that they all helped with the funeral arrangements, including Miss Losey.

No claims were made by the plaintiff to the administrator, to the decedent's daughter or to any one else, so far as the record shows, until this suit was instituted, to the effect that the decedent had promised to convey his property to the plaintiff in consideration for her services or for any other reason. Immediately before or shortly after the funeral, when asked whether the decedent was indebted or owed any money, Miss Losey stated that as far as she knew he was not indebted to any one, or, as she explained it, he did not owe any money.

The record fails to disclose any evidence corroborating that of Miss Losey as to a contract, or the terms of an agreement, between her and Barber. There is, however, a great deal of evidence from at least twelve different witnesses indicating that Barber stated that he intended Miss Losey to have his home place after his death. The language of some of these witnesses is to the effect that Barber stated to them that he was going to give the place to her, while others testified that Barber said that the property would go to her when he was gone, or that if anything happened to him, Miss Losey would get the place. He did not say to any one, so far as shown by the record, that he had promised Miss Losey to give the property to her for services performed or to be performed by her for him. According to these witnesses, the reason stated by

Barber for wanting to give his property to Miss Losey was that she had been kind and helpful to him. Some of the witnesses testified that he largely attributed his recovery from illness to the care Miss Losey gave him.

The plaintiff testified that Barber stated to her that he had tried to get his daughter to come and visit him shortly after the death of his second wife, and that his daughter had said that "she would not come that far away from home". In the fall of 1936, according to the plaintiff's testimony, Barber again attempted to prevail upon his daughter to visit him, and offered her "$100 to come one way and he would pay her fare back when she left, and she refused, saying that was not money enough".

One witness called by the plaintiff stated that Barber told him that he had attempted to get his niece (apparently his granddaughter) to come and visit him and had offered to send her $100 for the trip, but the granddaughter had said that was not enough, which greatly angered Barber. This conversation was had less than a year prior to the date of the trial. The same witness also said that Barber told him, some time after he first said that the property was going to Miss Losey, that he, Barber, had had trouble with her father and was not going to give the real property to her.

Another witness called by the plaintiff stated that Barber said he was going to give his property to Miss Losey for the reason that his relatives in the East did not show any regard for him.

Mrs. McGregor testified that after her father came west she heard from him or from her stepmother about three times a year, at first; that during the last two years of her father's life she had quite frequent correspondence with him; and that after her stepmother's

death her father did write to her and ask her to spend the winter with him, and offered to pay her transportation, but because she had five children, the youngest of them three years of age, she advised her father that she could not leave home then, but would come at the end of the school year, although she preferred that her father would go to live with her. In the fall of 1936, according to Mrs. McGregor's testimony, her father wrote and asked that her daughter come to see him, but what was the outcome of that correspondence the record does not show. In no instance, according to Mrs. McGregor's testimony, did she refuse to come to her father because of insufficiency of funds offered by him. In no instance did he make a definite offer of any sum, and at no time did she demand any amount of money, she testified.

The plaintiff, Miss Losey, testified that Barber told her that he had made a deed to her for his home property and that he had "put it in a box in the Woodburn bank, and that upon his death that box could not be opened without the presence of the witnesses, that I was to get the deed, and, as soon as I could, have it recorded, that it would cost me $1.50, and he told me a good many times to have that done right away". She further testified that Barber stated that he wanted to give the property to her by deed rather than by will because "he did not believe in wills, they could be broken. They was not worth the paper they were written on. If he gave a deed, that could not be broken."

Most of the witnesses who testified concerning their conversation with Barber relative to his giving the property to Miss Losey stated that he did not say whether he intended to convey it to her by deed or by will.

One of the witnesses for plaintiff testified that Barber told him that he had a deed already made out to Miss Losey for his property. Three witnesses testified that he told them, ''the papers were all made out'' or that ''all the matters had been fixed up''. One of these witnesses, Ted Lukos, said that while he was visiting at Barber's home, Barber went to his trunk and took out some papers, which he wished the witness to look over, but the latter, according to his statement, ''never wanted to read anything like that'' and did not look at the papers and did not know whether they included a deed or not. He further stated:

''He [Barber] told me he had the papers made out for this girl and all to . . . this is because his daughter refuse to come. He wrote the letter for his daughter to come visit, and daughter refuse to come because he didn't send $500 for her to come.''

It is not contended by the plaintiff in this court that the record in the case is sufficient to prove that the decedent, Stafford Barber, actually did execute a deed conveying to the plaintiff the real property in dispute and did place the deed in a bank to be delivered to her upon his death. In fact, it is conceded by the plaintiff that the evidence is insufficient to establish such deed as a lost instrument. We may, therefore, ignore the allegations of the complaint concerning the execution by the decedent of a deed to the plaintiff. The only purpose of introducing evidence concerning the execution of a deed by Barber was, according to plaintiff, to substantiate her claim that the decedent had contracted to convey the real property to her.

We now proceed to a consideration of the alleged oral agreement whereby the decedent promised to convey his real property to the plaintiff in consideration for her promise to perform certain services for him. It has been held so many times by this court that such

contracts may be enforced in equity that citation of authority on that point is unnecessary. However, before a contract of this kind will be enforced it must be established by clear and satisfactory evidence. The agreement must be "clear, just, definite, reasonable and mutual in its obligations", and there must be a strict performance by the promisee of all the terms and conditions of the contract: *Mathews v. Tobias,* 101 Or. 605 (201 P. 199); *Mathews v. Tobias,* 126 Or. 358 (268 P. 988); *Shepherd v. Allingham,* 132 Or. 684 (288 P. 210); *Magness v. Magness,* 148 Or. 44 (33 P. (2d) 1005).

■ In addition to the above requirements, it must also appear, when the conveyance is promised in consideration of the performance of services by the grantee or devisee, that the rendition of such services is "wholly referable to the contract to convey and solely predicated upon that agreement, and that proper and adequate compensation for the services can not otherwise be made", and that "such services must be of exceptional character or of such a peculiar value to the promisee that the value thereof is not subject to pecuniary estimate": *Brennen v. Derby,* 124 Or. 574 (265 P. 425); *Vandiver v. Stone,* 149 Or. 426 (41 P. (2d) 247); *Woods v. Dunn,* 81 Or. 457 (159 P. 1158); *Traver v. Naylor,* 126 Or. 193 (268 P. 75); *Matthews v. Taylor,* 142 Or. 483 (20 P. (2d) 806); note, 69 A. L. R. 32, 145.

In the case of *In re Peterson,* 76 Neb. 652 (107 N. W. 993, 111 N. W. 361), the proposition that the alleged contract to devise real property must be established by clear and satisfactory evidence was vigorously attacked by the plaintiff, who contended that only a preponderance of the evidence was required in any civil action. Answering that argument, the court said:

"It may be said, however, that while it is true that a preponderance of the evidence is all that is required

of the plaintiff in any civil action, yet the nature of some cases is such that the probative force of testimony may be weakened or counterbalanced to some extent by the existence of legal presumptions or other circumstances which may affect its credibility. Where it is sought to establish a resulting trust by parol evidence, or where it is sought in effect to evade the statute of wills or the statute of frauds in like manner, or where conveyances have been made by parties in failing circumstances to near relatives, the circumstances of the case require that the proof be clear and satisfactory in order to overcome the presumptions which the circumstances raise. The nature of the case demands a closer scrutiny of the evidence than in any ordinary controversy; but if after testing it by these canons it preponderates in favor of the plaintiff it is sufficient to justify and sustain a finding in his favor.''

■ In many instances the terms and conditions of a contract of the nature of the one here involved are unknown to any one other than the parties to the agreement, and the enforcement of the contract is not sought until after the death of one of the parties to it. Although in many states the claimant is precluded by law from testifying after the death of the other party, to the terms of the alleged contract between them, such is not the rule in Oregon.

Turning now to the purported contract in the instant case, we find that the only evidence concerning the terms and conditions thereof is that which was given by the plaintiff herself. Briefly stated, that promise of the decedent to the plaintiff was to give her certain real property in consideration of her performing household and possibly nursing services for him. She had been rendering such services prior to the alleged making of the contract, and thereafter continued to render them. She was paid the same wage after the making of the contract that she had previously been paid, and

in her own words, it was sufficient compensation for the services she performed. To render such services, the plaintiff was not obliged to forego her other pursuits or employment. She did not in any way alter her mode of living, nor did she suffer detriment in any respect.

■ The evidence introduced as to what the decedent said he intended to do with his real property upon his death is not referable to any contract between him and the plaintiff. Nowhere in the record, as before pointed out, is any statement attributed to him which could be said to indicate that there was an agreement between Barber and the plaintiff. In fact, the statements of some of the plaintiff's own witnesses to the effect that the decedent intended to give the property to Miss Losey because of the indifference of his own relatives to him, and his later remark that he had decided not to leave the property to her because of his difference with her father, would tend to negative the existence of any contractual obligation on his part.

The record does not show that Miss Losey disclosed to any person the arrangements she claims to have had with the decedent. Although she testified that she had been informed by the decedent that he had already made a deed and placed it in the bank and that she was to get it and record it immediately upon his death, she apparently took no steps to ascertain whether the instrument was in the bank, and made no inquiry of the administrator or any one else connected with the decedent's estate, as to the existence of such a deed. In relating on direct examination her version of the contract, she stated that the agreement required her to go to Barber's home every Thursday. When confronted on cross-examination with the fact that she had failed to do so for several weeks each

year, her reply was that while she was employed in the cannery the agreement excused her from rendering weekly services to the decedent. Moreover, she did not, in referring to the terms of the alleged contract, mention the fact that she was to receive, and did receive, the same pay for her services subsequent to the making of the contract that she had prior thereto been paid for the performance of similar duties.

In our opinion, the plaintiff has failed to prove by clear, satisfactory and convincing evidence the terms and conditions, and performance by herself, of the alleged contract between her and Barber. Furthermore, the alleged contract by its nature did not require her to render any unusual or peculiar services which could not be and were not compensated in money. Nor did it require her to change her position or mode of living. She was not obliged to forego any benefit or suffer any detriment in order to perform the services which she rendered the decedent. She has, according to her own statement, been amply paid for such services. The decree appealed from, therefore, is reversed and the cause is remanded to the circuit court with instructions to dismiss the suit; neither party to recover costs.

BEAN, C. J., and RAND and LUSK, JJ., concur.