Argued February 8; affirmed June 6, 1939

## HARRIS *v.* CRAVEN ET AL.

(91 P. (2d) 302)

Department 1.

*W. T. Vinton*, of McMinnville (Vinton, Marsh & Marsh, of McMinnville, on the brief), for appellant.

*George Neuner*, of McMinnville (Oscar Hayter, of Dallas, and James E. Burdett, of McMinnville, on the brief), for respondents.

ROSSMAN, J. This is an appeal by the plaintiff, who is the widow of T. J. Harris, from a decree of the circuit court in favor of the defendants, one of whom is the executor of the decedent's estate, and the remaining five of whom, brothers and sisters of the deceased, are the beneficiaries of his will. The purpose of this suit is to secure specific performance of an alleged oral promise, which the plaintiff claims her husband made to her in July, 1933, to bequeath all of his property to her. June 9, 1933, he signed his aforementioned will. She claims that she was unaware of that fact when the alleged promise was made. The following is the only paragraph of the will which mentions the plaintiff:

"I give and devise to my wife, Mabel Harris, in case she shall still be my wife at the time of my death, the dower interest allowed to her by law in and to all real property of which I may be seized at the time of my decease. In case she shall not be my wife at the time of my death, then it is my will that the said Mabel Harris take nothing under this will."

No children were born to the marriage. Harris's estate was worth approximately $22,000 at the time of his death. The defendants deny that the alleged oral

promise was made, and, in addition to other matters, contend that the plaintiff failed to do the things which she avers she promised to do in exchange for her husband's purported promise.

The appellant's brief states: "The controversy involved herein is largely a factual one." With that we agree. August 19, 1930, when the plaintiff was 49 and Harris was 56 years old, they were married. The plaintiff at that time was a widow, and Harris had been married and divorced three times. At the time of their marriage Harris, according to the plaintiff, was indebted to her in the sum of $1,175 on account of wages for services she had rendered him, and in an additional amount of $1,800 for personal property which he had purchased from her. The services, according to her testimony, began March 8, 1928. At that time Harris's home was in Hopewell where he operated a general merchandise store.

On October 26, 1927, the plaintiff's first husband, W. A. White, died, bequeathing to her, on condition that she not remarry, an estate worth a little more than $5,000 consisting, in part, of a general merchandise store located at Hopewell. White's will provided, however, that in the event the plaintiff remarried her interest in the estate should be reduced to one-fourth and that the other three-fourths should belong to their three children. Shortly after White's death Harris suggested to the plaintiff that she sell the store's stock of merchandise to him and enter his employ as a clerk in his store and as housekeeper in his home. The plaintiff testified that Harris offered to pay her $50 a month for the services of herself and her 15-year-old daughter Goldie, in addition to providing room and board for the two. The sale was made and the two

entered Harris's employ March 8, 1928. While the plaintiff's testimony is somewhat uncertain, she indicated that the price of the merchandise was $1,200, to be paid upon its delivery to Harris. White's estate owned the small building in which his store had been housed. About a year after the plaintiff had entered Harris's employ the building was demolished and Harris purchased the lumber. The complaint avers that the value of the latter was $600. We are satisfied, however, that its value was virtually inconsequential. In the meantime, the plaintiff's children surrendered to her the interest their father's will gave to them conditioned upon their mother's remarriage.

The plaintiff swore that neither her wages nor the sum due for the above-mentioned personal property (merchandise and lumber) were ever paid. In explanation, she said that she and Harris contemplated marriage when the above transactions occurred, and that he repeatedly assured her that the unpaid sums were purchasing for her and her daughter an interest in the store. September 12, 1929, the store was used as part consideration for the purchase of a farm located three miles from Hopewell. When Harris moved to the farm the plaintiff and her daughter went with him. The plaintiff claims that she continued in Harris's employ and was promised $25 per month for her services as housekeeper in the home and as helper on the farm. She swore that none of these wages were ever paid, but that when the farm was acquired Harris said "my interest would be just the same on the farm as it was in the store."

August 19, 1930, the plaintiff and Harris were married. About this time, according to the plaintiff, Harris told her that "he was building up the farm, and I was

to get the farm—I or my children, was to get the farm.'' She swore that no mutual wills or any deeds evidencing such a condition were prepared, and when asked "Why not?" replied, "Well, I just trusted him.''

A few days prior to April 27, 1933, a serious quarrel between the two developed and on that day the plaintiff and her daughter left. In the early part of June, 1933, Harris had three conferences concerning a will with E. J. Claussen, an attorney located in Tillamook. As a result, Claussen prepared the will above mentioned and on June 9, 1933, Harris signed it.

Following her departure from their home the plaintiff upon her own volition made three brief visits to the farm, and in the latter part of July a conference was arranged for the two to take place in the office of W. T. Vinton, an attorney in McMinnville. Both parties knew Mr. Vinton. He had acted as attorney for the plaintiff when she served as the executrix of the estate of her first husband, and upon the separation she had consulted him with reference to a suit for divorce against Harris. After the separation she returned several times seeking advice concerning the divorce and her property rights. The plaintiff testified that she attended the conference in Vinton's office under a belief that a divorce and settlement of her property claims against her husband were the matters to be considered. Other evidence indicates that Harris went to the conference because of a letter he had received from Vinton requesting him to come. Be the facts as they may, husband and wife entered Vinton's private office shortly before noon upon the occasion with which we are now concerned. It was at the close of this conference that Harris, according to the plaintiff, made the promise upon which this suit is based. The plaintiff

testified that at the outset Vinton endeavored to effect a reconciliation and that her husband expressed himself as anxious to have her return. However, she replied that Harris had been so abusive and that the abuse had had such ill effects upon her health that necessity compelled her to decline their pleas and to insist upon a divorce. An hour or so after the conference had begun Vinton left, leaving the plaintiff and Harris as the only occupants of the room. Harris then repeated his entreaties that she return to his home, promising that he would treat her properly. During all of this time, according to the plaintiff, she was insisting upon a property settlement, but could obtain no expressions from her husband concerning her claims. Finally, as the hour of 5 drew near, the plaintiff yielded. She testified: "He (Harris) said that he would be good to me, and that he needed me and if I would help—if I would keep this property together and not go ahead with my divorce and come back to him and take care of him and help him take care of his property and help him care for his brother—this deaf-mute brother—that he would give me everything he had." Harris had a deaf-mute brother, S. J. Harris, commonly known as Wallie, whom he had promised his mother to care for. He also had two sisters, Mrs. Nancy Craven and Mrs. Kathleen Owens, who were afflicted with the same congenital disability. Each of the three was past 70 years of age and in poor financial circumstances. They are three of the five defendants. Further, the plaintiff testified: "He (Harris) told me if I would come back and take care of him and keep the property together and help him take care of his property and his—help him look after his brother, this mute brother, that he would give me everything." The

plaintiff stated that at this juncture she yielded and agreed to return to their home.

The words quoted in the preceding paragraph seem to be the clearest expression of the alleged promise which can be found in the transcript of evidence. The complaint avers that in consideration of Harris's purported promise "the said plaintiff promised and agreed to return and live with the said T. J. Harris * * * and promised and agreed to forego and forbear said contemplated suit for divorce and forbear and forego her claim for a property settlement and alimony * * * and to also assist in taking care of S. J. Harris, the afflicted brother of the said T. J. Harris." The defendants admit that upon the above occasion a reconciliation was effected, but deny that Harris made any promise to give to the plaintiff his estate or any part of it. The plaintiff testified that after they had effected their understanding, Vinton, who had come back to the room from time to time, returned once more. We now quote from her testimony: "I told Mr. Vinton that we had agreed to go back and we had arranged our property settlement and we wasn't going to get any divorce. Mr. Vinton said he was glad of that." She testified that she told Mr. Vinton nothing more about the agreement than is embraced in the words just quoted, adding, "I didn't think it was necessary." She admitted that although Mr. Vinton and his stenographers were still in his office at that time, she did not request that the purported agreement be reduced to writing. The parties then left. The plaintiff does not claim that she ever returned to Mr. Vinton's office. Her daughter Goldie, who was then about 20 years of age, had accompanied her mother to McMinnville but had not gone to the attorney's office with her. As the

plaintiff and Harris left the office they were met by Goldie who described what then took place in the following words: "He was right behind her and I said, 'Did you get all your things fixed up?' I was kind of tired of waiting and I said, 'Did you get all your things fixed up for your divorce?' And he came down another step or two and he said, 'Goldie, she is not going to get a divorce.' And I said, 'How come?' And he said, 'Well, she is going to come back and live with me.' And I said, 'How about all this money and things that you owe her?' And he said, 'Well, we are not going to part the property any more. She is coming back. I am sick and I can't get along without her, and,' he said, 'she is going to come back and we are going to make a go of it this time. We are going to keep our property together. She is going to help take care of my property and I am going to give her and you children everything.' " The term "you children" referred to the plaintiff's three children by her first marriage of whom Goldie was the youngest. The day following the reconciliation the plaintiff returned to the farm. After her return the parties lived in a reasonably harmonious manner until Harris's death, August 7, 1936.

We have mentioned the testimony of Goldie White upon which the plaintiff relies to support her claim. We shall now review the testimony of four other witnesses called by the plaintiff. Mrs. Phoebe Busick swore that she was upon the Harris farm in July, 1933, the day the plaintiff returned, and that at that time Harris said to her that "he didn't know if she came back to him because she loved him or whether she came back to him for his money, 'but, anyway,' he says, 'that part's all fixed and we have talked it all over.' " Continuing, she testified: "He said that they had talked

it all over in Vinton and Marsh's office, and that is all I know. He didn't say anything about the understanding or what it was, or anything about it." November 16, 1933, Harris sold the farm and repurchased the store mentioned in a preceding paragraph. Wello Forrest testified that in 1935 he had a conversation with Harris. We now quote from the witness's testimony: "He (Harris) wanted to leave the farm to Mrs. Harris and the children which he always referred to as 'the girls' so that it would be a home for them. And he said he also had a home in town which I knew about, and he said, 'I want to leave that to them.'" It will be recalled that the farm was sold in 1933.

August 1, 1936, Harris was stricken with a severe illness. On that day he was visited by his physician, Dr. E. H. Barendrick, who advised him to go to a hospital. The physician testified that Harris refused to go that day, explaining that "he had some business details which he wanted to take care of before he come in." The following day Ed Loop, a neighbor, took him to the hospital in his car. While riding to the hospital Harris told Loop that "he would have to get his lawyer from Tillamook and get his papers fixed up." Loop added, "That is about all he said. I didn't ask no questions." According to Dr. Barendrick, when Harris reached the hospital "he realized the extreme danger of his own condition and implied to me that he did have some business details which he wanted to take care of, and particularly he wanted to get in touch with someone in Tillamook." No names were mentioned. The plaintiff swore that early Monday morning, August 3, she found her husband "worrying about some insurance policies." At that time he was in great physical agony. We now quote from her testimony: "We hadn't

been speaking about anything else then, only just these insurance policies, and he said, 'Oh, get Mr. Clausen here.' 'Phone for Mr. Clausen,' he said, in such an agonized voice that I didn't know what to do. The way he said it. He said, 'Oh, get Mr. Clausen here.' 'Phone for Mr. Clausen.' * * * That was just before he was operated on * * * . I said, 'What do you want with Mr. Clausen?' And he—I don't remember, I was worried so—he said either, 'Advise me,' or 'He has always advised me.' I don't remember which." The plaintiff testified that she spoke to Mr. Claussen on the long-distance telephone and that, since he replied it would be inconvenient for him to come at that time, she did not insist. Apparently no one at that time anticipated that in a few days Harris would die. Following the operation which was performed on Monday, Harris became desperately ill and four days later died. Claussen testified that Harris had no unfinished business in his office near the time of his death.

The above, we believe, is a fair review of all of the testimony upon which the plaintiff relies to substantiate her cause. Some details have, of necessity, been omitted.

The defendants deny that Harris left undischarged any debt to the plaintiff. They presented evidence indicating that the plaintiff was paid her wages from time to time, and that payment in full was made for the lumber and the merchandise. It developed that the alleged sum of $1,200, purchase price of the merchandise stock, was due to the estate of her first deceased husband, and not to her individually. The probate proceedings, while not unequivocal, indicate that it was paid. The defendants also presented evidence showing that Harris, at the plaintiff's request, had advanced

substantial sums to two of the plaintiff's children by her first marriage. To one of her children he loaned $1,460, accepting a note, payable to the plaintiff, secured by a chattel mortgage. The note was never paid, but later the plaintiff recovered $400 out of the security. Their evidence also indicated that the plaintiff's insistence upon more financial help for her children was the cause of the domestic strife.

We have mentioned the fact that the alleged promise to bequeath the entire estate to the plaintiff was made in the office of Mr. Vinton and that, although he and his stenographers were still in the office after the promise is said to have been made, no written evidence of it was prepared. The plaintiff offered no explanation of this omission, and Mr. Vinton, who was ill, did not testify. The plaintiff had had substantial business experience and was familiar with at least the rudiments of bookkeeping. With her husband she had had the opportunity of learning something about litigation, for the two, in March, 1933, were made defendants in an action to recover a real estate broker's commission in the sum of $1,000. Mr. Vinton was their attorney in that action. As executrix of her first husband's estate, she had had additional opportunities to observe, especially to learn something about the value of written wills.

Immediately following Harris's funeral, which was conducted in Tillamook, several of his relatives and others interested in his estate, including the plaintiff and her daughter Goldie, repaired to the office of Mr. Claussen. The hour was 3 p. m. Claussen, before speaking to the others, called the plaintiff into a separate room and there showed her Harris's will which since its execution had reposed in Claussen's

safe. This seemingly was her first knowledge that such an instrument existed. Claussen testified that her first expression was, ''Well, what about my store? It was merged with his.'' By that question she had reference to the stock of merchandise which Harris had purchased from her before the marriage. The plaintiff and Claussen then returned to his office where the will was displayed to all present; more than one read it. In the course of the meeting the plaintiff, Goldie and others asked Claussen questions concerning the will which he answered. The plaintiff freely concedes that at that time she made no mention of the purported oral agreement whereby she claims she was to receive the entire estate. She explained that the confusion and grief attendant upon the situation accounted for her silence; but we observe that she promptly asked the above-quoted question concerning the sum she claimed was due her for her stock of merchandise. Eventually the group dispersed, but later in the afternoon the plaintiff and her son returned to Claussen's office and then a discussion of some length took place between these two and Claussen. In the course of this discussion the plaintiff commented upon an instance with which she was familiar in which a will ''had been broken,'' but did not mention the alleged oral contract. Next, they discussed the possibility of the existence of a later will, and to assure himself Claussen telephoned to someone in McMinnville whom he thought might possess information upon the subject. After the plaintiff left Claussen's office she and her daughter met upon the street Emma Latimer and Myrtle Owens, nieces of the deceased, who were among those present at the 3 o'clock conference in Claussen's office. The four engaged in a conversation in which both the

will and Goldie's claims were again discussed, but, as before, the plaintiff made no mention of her alleged oral agreement. So far as the record discloses, Claussen and the other defendants received their first intimation concerning the alleged oral contract through a notice which the plaintiff sent to all of them on November 13, 1936, shortly before this suit was instituted.

In addition to testifying as above indicated, Claussen mentioned a visit which Harris and his wife made to his office after the will had been signed and after the reconciliation. At that time the will was in Claussen's safe. We now quote from the witness's testimony: "Well, I asked him when I had opportunity, when Mrs. Harris wasn't present—I thought that she didn't know anything about it and when she was out of the room I asked him whether he—or just asked him about 'those papers in the safe' and he said, 'Oh, we will just leave them there.' That is as much as was ever said."

Myrtle Owens testified that July 24, 1934, her uncle (Harris) called at her home concerning his deaf-mute brother, the aforementioned Wallie. The latter was impecunious and dependent upon Harris for support. At that time, after discussing Wallie's sorrowful plight, Harris, according to Miss Owens, mentioned his will. We quote from her testimony: "And he says, 'Now, I have made my will and I have made it out to my sisters and to Mabel.' He says, 'I have left her a widow's dower.' And he says, 'The reason I am not leaving Wallie anything, only his dollar, is simply because I know that he will spend it and won't have it no time and the girls would have to look after him,' he said. 'I am leaving it to them so that they will look after him. I know that they will look after him.'" The will bequeathed to the testator's brothers one dollar

each, and all of the residue of the estate to the testator's three sisters.

Mrs. Emma Latimer testified that, shortly prior to Easter in 1936, she called upon her uncle who, after becoming reminiscent about some of his neighbors who had recently died, turned the conversation to himself. We now quote from her testimony: "And I thought when I first seen him that his face looked very flushed and his stomach seemed to protrude out quite a bit, but he had stomach trouble—complained of it before so, and I said—made the remark, 'Well, if you don't diet, you will—' and he finished, he said 'I will die.' He said, 'That is all right,' he says, 'everything is all fixed,' he says. 'I am ready to go any time.' "

Three or four days after the funeral some of Harris's relatives went to the Hopewell store to assist in the taking of an inventory. The plaintiff and her daughter Goldie were present. At this time, according to some of the testimony, the plaintiff expressed a desire to purchase the store. Even a price was mentioned. The plaintiff concedes the occasion, but claims that her interest in the matter was limited to the fact that her daughter claimed to be a partner in the enterprise with Harris. The defendants, of course, argue that an offer to purchase the store is inconsistent with the plaintiff's present claim of ownership. Later, in an action brought by Claussen, as executor of Harris's estate, to recover possession of the store, in which the defendants were our present plaintiff and her daughter Goldie, the latter filed an answer from which we quote: "The defendant Golda White admits that at the time of his decease T. J. Harris was the owner of an undivided one-half interest in a certain store situated in Hopewell," and claimed that she, Goldie White, was the

owner of the other one-half. The plaintiff, as a witness, acquiesced in her daughter's claim.

September 17, 1936, the plaintiff filed in the probate proceedings of Harris's estate a petition for a widow's allowance of $125 per month. The petition contained no intimation of the plaintiff's present claim that she was the owner of the entire estate. Rather it was founded upon the premise that the deceased owned absolutely the estate, and stated that the claims against it would not exceed $1,500.

By reverting to the terms of the purported contract, as related by the plaintiff, it will be observed that one of its provisions required her to "help him look after his brother, this mute brother," meaning Wallie. It seems that Wallie was somewhat irritable and that when left to himself was inclined to partake of liquor freely and squander his money. Harris was financially the most successful member of the family and had shown Wallie much consideration. He had frequently supplied Wallie's financial wants and over extended periods of time had permitted his deaf-mute brother to live with him. When the plaintiff entered Harris's home as housekeeper Wallie was living there. When Harris moved to the farm Wallie accompanied him. About four months after the reconciliation the farm was sold and the plaintiff and Harris then moved to Dayton, leaving Wallie behind upon the farm by virtue of an agreement with the buyer. Some months later they moved to Portland, and in June of 1935, upon repurchasing the store, returned to Hopewell. After Wallie had been left behind upon the farm he never again lived with the Harrises. From the farm he went to a relative who shortly passed him on to another, and, finally, after Wallie had exhausted his welcome every-

where, he was left upon Harris's doorstep. Harris promptly made arrangements with a neighboring family, name Stephens, to take care of the unfortunate man. The record indicates that after the purported contract had been made the plaintiff did very little for Wallie. She claims that Harris disliked having Wallie around, but we believe that the dislike was hers. Mrs. Stephens testified that when Harris asked her to take care of Wallie he told her "it just meant a separation" if he couldn't get Wallie away from his home.

Uncontradicted testimony shows that Harris gave close attention to his business affairs and that he bore a good reputation for integrity.

The above, we believe, is a fair review of all of the evidence which indicates whether or not the alleged promise to bequeath the estate to the plaintiff was made, and whether or not the plaintiff discharged her promise to "help him look after his brother, this mute brother." The plaintiff's testimony leaves uncertain the consideration for her husband's alleged promise to bequeath his entire estate to her; that is, it is uncertain whether she contends that the alleged prenuptial agreement concerning wages and merchandise was a part of the consideration. We, therefore, included in the preceding review the evidence concerning the merchandise and the wages. We are satisfied that, since the purported prenuptial consideration was purely monetary, and not of an exceptional character, it cannot serve as the basis of a decree for specific performance: *Losey v. O'Hair*, 160 Or. 63, 83 P. (2d) 493; *Mathews v. Tobias*, 101 Or. 605, 201 P. 199; and *Faunce v. Woods*, 5 Fed. (2d) 753, 55 App. D. C. 330, 40 A. L. R. 208.

The defendants argue that § 11-504, Oregon Code 1930, is applicable to this suit and that the plaintiff

has not met its requirements. The part of the section upon which the defendants rely is:

"No claim which shall have been rejected by the executor or administrator, as aforesaid, shall be allowed by any court, referee or jury, except upon some competent, satisfactory evidence other than the testimony of the claimant."

■ An executor in this state derives his authority from the will. He is the person in whom the testator reposed confidence and to whom he confided the eventual execution of his will. Since it is his duty to carry into effect the provisions of the will, he must be loyal to it and obedient to its requirements. If the defendants' contentions are correct, the will signed on June 9, 1933, was the decedent's last testament, and Claussen who was nominated by it as executor was required to carry out its provisions. But if the plaintiff's evidence is true, that will was succeeded by a subsequent oral contract and, therefore, upon the decedent's death his estate belonged to the plaintiff. In that event, the will had been revoked and Claussen, upon assuming possession of the property, held it in trust for her. Claims within the contemplation of §§ 11-503 and 11-504 are such demands as the personal representative can satisfy out of the general funds of the estate. They are pecuniary in nature. The demands of a *cestui que trust* to property held by the decedent in trust for him at the time of his death is not deemed a claim within the contemplation of statutes of the above kind. 24 C. J., p. 334, § 956. The plaintiff's demand, therefore, was not one which fell within the scope of Claussen's official duties. He could not, as executor, either allow or disapprove it, and that being true, the plaintiff owed no duty to submit the claim concerning it to him. Since

§ 11-504 had no application to the plaintiff's demands, it was not necessary for her to submit corroborating evidence in support of her testimony.

 Although it was not technically necessary for the plaintiff to submit corroborating evidence, nevertheless the burden was upon her to establish with the required degree of cogency every fact which a court of equity demands in suits seeking the remedy of specific performance. That remedy, as is generally said, is not available as a matter of absolute right, but rather as a matter of grace; or, stated otherwise, as the result of the exercise of sound judicial discretion. In applying these cautionary rules, the courts exercise care and discrimination in weighing the evidence. When a party seeks to prove and enforce a contract to devise property, the courts are especially disposed to adhere to these rules. As Mr. Justice WOLVERTON pointed out in *Rose v. Oliver*, 32 Or. 447, 52 P. 176, the contract to make a will, as distinguished from a will, is not revocable. He accompanied that observation with a quotation from *Gall v. Gall*, 64 Hun. 600, 19 N. Y. S. 332, which stated that oral evidence in support of alleged contracts to make wills "is regarded with suspicion, and not sustained, except upon the strongest evidence." Mr. Justice BEAN, in *Shepherd v. Allingham*, 132 Or. 684, 288 P. 210, expressed concisely the essence of earlier decisions when he stated: "To establish such an oral contract, as alleged by the plaintiff, requires a high degree of proof which must be clear, definite and certain. Such transactions are to be carefully scrutinized: *Sappingfield v. Sappingfield*, 67 Or. 156, 135 P. 333; *Brennen v. Derby*, 124 Or. 574, 265 P. 425; *Mathews v. Tobias*, 126 Or. 358, 268 P. 988." In *Magness v. Magness*, 148 Or. 44, 33 P. (2d) 1005, the decision stated

that in suits of this kind where the alleged promisor is dead, the testimony must be "clear, convincing, satisfactory, definite." In *Losey v. O'Hair*, 160 Or. 63, 83 P. (2d) 493, Mr. Justice BAILEY, by quoting from *In Re Peterson*, 76 Neb. 652, 107 N. W. 993, 111 N. W. 361, accounted for the fact that while nothing more than a preponderance of the evidence is required, nevertheless, in suits to enforce an agreement to devise, the proof must possess a high degree of cogency. In that case (*In Re Peterson*) the court pointed out that in such instances the proof in support of the claim is often "weakened or counterbalanced to some extent by the existence of legal presumptions or other circumstances which may affect its credibility". It continued: "Where it is sought to establish a resulting trust by parol evidence, or where it is sought in effect to evade the statute of wills or the statute of frauds in like manner, or where conveyances have been made by parties in failing circumstances to near relatives, the circumstances of the case require that the proof be clear and satisfactory in order to overcome the presumptions which the circumstances raise." See a similar explanation in *Metropolitan Cas. Ins. Co. v. Lesher*, 152 Or. 161, 52 P. (2d) 1133.

There are circumstances which have a tendency to discredit the plaintiff's testimony. She denied that Harris paid for the stock of merchandise above mentioned. Her entries, as executrix of the estate of her first husband, together with other evidence, strongly indicate that she was paid in full for that property. Again, the manner in which she circumvented her first husband's will and obtained for herself property which he intended the children should have in the event of her remarriage indicates that she attaches very little

importance to the wishes of a testator. We are some-
what inclined to believe that after depriving her chil-
dren of what her first husband intended they should
have, she sought to make amends to them by gaining
something from her second husband which was not
rightfully due from him. She admitted that the afore-
mentioned loan of $1,460 was obtained from her hus-
band (Harris) in favor of one of her daughters, Irene,
when the latter signified objections to the marriage.
That was the use of "hush money", if we may use the
term, in an aggravated form.

■ Let us now ascertain whether the evidence sub-
mitted by the plaintiff overcomes the suspicion with
which it must be viewed and the presumptions which
it faces. The latter are mentioned in the quotation
from *In Re Peterson, supra.* The contract, if it was
made at all, was effected in the office of the plaintiff's
legal representative. The attorney and his stenogra-
phers were still in the office after the purported agree-
ment had been made. The plaintiff concedes that she
went to the office, not merely to have a place in which
to confer but for the purpose of settling a matter
which she thought would require the services of her
attorney. Mr. Vinton also thought that he might be
called upon to do something in his professional capac-
ity and remained until the parties had completed their
conference. We scarcely need to add that Mr. Vinton's
well-merited reputation as an able attorney was an
assurance to these people that when they had settled
their difficulties the expression of their agreement
would be placed in proper legal form. For six hours
this protracted conference had continued in one of
the rooms. The members of the office staff knew of the
domestic difficulties which had troubled these two

people. One of the stenographers, as a witness, told of the number of times that each of them had called upon Mr. Vinton, and added that many times when Harris had to wait to see Mr. Vinton he consumed the time by telling ''Madeline and I, the other girl in the office, his troubles, and he usually would cry and speak about his wife had left him and they were not living together, and what a hard time he was having, and sick, and * * *.'' No imagination is needed to tell one that as this conference dragged on hour after hour everyone outside of the conference room became beset with a growing curiosity to hear how these two people would eventually adjust their domestic affairs. Surely, if a contract for a will was effected which terminated a six hours conference and a three months separation, the plaintiff would have mentioned it to Mr. Vinton when she came out of the room. If, as the plaintiff emerged from the room, she believed that she had a promise for the devise to her of all of her husband's property—a type of agreement which is something of a novelty even to many seasoned attorneys—we feel sure that she would have sought the advice of Mr. Vinton or one of his partners concerning its legality. To the contrary, this is what happened when they came out of the conference room, according to the testimony of the aforementioned stenographer, Mrs. Kathleen Cummings: ''Well, I remember that when it was all over they came out and apparently were very happy, and, of course, I don't remember that anything was said right then, but it was my impression from some source that they had made up and were going to live together again, but to be really definite about it—I don't know just—'' In a preceding paragraph we quoted the plaintiff's description which is substantially

similar to Mrs. Cummings'. Let us remember that when the plaintiff went to the attorney's office she had definitely in mind a demand for a property settlement and that she kept on urging one during the conference. Surely if she obtained one—in the form of a contract for a will—it would have been on the tip of her tongue when she spoke to Mr. Vinton. The plaintiff was not a stranger to the ways of business, of litigation and of a law office, but, as we have indicated, had been in a business venture, had been the executrix of an estate, had been a party-defendant in a law suit, and had been in Mr. Vinton's office many times. Under these conditions to ask us to believe that she walked out of that room with an oral contract for a will, and yet mentioned it to no one for more than three years, is to request something which we cannot yield.

Moreover, she knew that she was in a difficult position. Her husband had a brother and two sisters who were deaf-mutes. The brother, as the plaintiff knew, was dependent upon her husband for support. She knew that through inability of these three people to participate in the ordinary way in conversation they could not keep themselves apprised of what was going on within the family circle. An instrument in writing was essential to convince them that a purported contract had really been effected. With that fact present, it is impossible to believe that she would have been content with an oral agreement.

The above are not by any means the only circumstances which indicate that the promise was not made. The plaintiff's narrative of the agreement and the one given by her daughter do not dovetail. The failure of the plaintiff to mention the purported contract during her conference with Mr. Claussen and upon the two

succeeding occasions above mentioned, when it would have been natural for her to have done so, is a strong indication that it was never made. Likewise, her petition for a widow's allowance and her overtures concerning purchase of the store are inconsistent with her contention that she was the owner of the estate.

There remains for consideration the testimony already mentioned that when Harris was being taken to the hospital and in the hour preceding his operation he expressed a desire to see Mr. Claussen. Since the latter testified that at that time Harris had no unfinished business pending in his office, an inference is possibly warranted that Harris desired Claussen to do something about the will. It may be that since the will was written in the period of the separation and before the sale of the farm in which the wife had a dower interest, Harris thought he would like to insert in it a bequest for his wife. But his desire to see Claussen certainly does not warrant a belief that he desired to bequeath his entire estate to her. It seems clear that he wanted to leave something out of which Wallie could be supported, and possibly something for his two afflicted sisters. The plaintiff's financial condition was superior to that of these three. So far as the record indicates, she still owned a farm of 68 acres and a house and three lots in Hopewell obtained upon the death of her first husband. Hence, her needs were not as pressing as those of Wallie. Had the parties not sold their farm the plaintiff's dower rights would have been valuable. At the time of his death Harris owned a small home in Portland appraised in the inventory as worth $1,000, and a piece of property in Garibaldi, Tillamook county, in which the dower rights were apparently of no value. It may be that if

Harris had succeeded in gaining a few minutes with Claussen he would have changed his will, but even if it could be demonstrated that that were true, still it would not prove that the alleged contract was made. If he contemplated doing nothing more than adding a codicil, or in some other way altering the will, we would have a refutation of the existence of the oral agreement, rather than an affirmance of it. Claussen's description of the visit which the plaintiff and Harris made to his office some time after the reconciliaton, when the will was reposing in the attorney's office safe, is an indication that Harris was satisfied with his will. He, as one of the parties to the alleged agreement, in that way indicated that he had never made the purported contract.

Since the circuit court found for the defendants, it very likely believed that the alleged contract was never made. Our consideration of the testimony brings us to the same conclusion. It follows, therefore, that the decree of the circuit court is affirmed.

RAND, C. J., and KELLY and BAILEY, JJ., concur.