Argued January 31; affirmed April 9, 1940

## STEVER v. HOLT ET AL.

(100 P. (2d) 1016)

In Banc.

*MacCormac Snow*, of Portland (Wm. A. Carter, of Portland, on the brief), for appellant.

*George L. Rauch*, of Portland (C. M. Idleman, of Portland, on the brief), for respondents.

ROSSMAN, J. This is an appeal by the plaintiff from a decree of the circuit court in favor of the de-

fendant, Pearl A. Holt, entered in a suit which the plaintiff instituted for the purpose of securing specific performance of an alleged oral contract whereby Catharine Canaris, now deceased, agreed to devise all of her property to the plaintiff. According to the complaint, the contract was made March 1, 1937. Besides binding Mrs. Canaris to devise her property to the plaintiff, the purported contract bound the latter to make her home with Mrs. Canaris and "care for, nurse and protect the said Catharine Canaris during the balance of the life of the said Catherine Canaris."

■ Mrs. Canaris' death occurred suddenly and unexpectedly May 24, 1938, when she was 78 years of age. The plaintiff was then 57 years old. Between the time of the alleged contract and Mrs. Canaris' death virtually fifteen months passed. The plaintiff was paid nothing for the services which she performed in that period, but during it Mrs. Canaris attempted to make some gifts to her, including a watch. The latter was accepted. An elderly roomer (W. J. Idleman) who stayed with Mrs. Canaris paid the plaintiff $10 per month for services which she performed for him. Mrs. Canaris' estate was appraised as worth $6,443.60. May 28, 1938, a will was discovered which Mrs. Canaris had executed September 1, 1933. It bequeathed sums of money ranging from $5 to $200 to several of her nieces and nephews (total $670) and gifts to several friends. Her home and the residue of the estate were devised to the defendant, Mrs. Holt. All of the aforementioned beneficiaries were made defendants, but all except Mrs. Holt defaulted. We shall hereafter refer to her as the defendant. Mrs. Holt denied the averment that the alleged contract was effected, and claimed that the will of September 1, 1933, was never revoked. That instrument was admitted to

probate May 31, 1938, without protest from anyone. Pursuant to its terms, the defendant was appointed executrix of the deceased's estate. Neither the plaintiff nor the defendant was related to the deceased, who was a widow without living issue.

According to the plaintiff, Mrs. Canaris was a student or adherent of a form of eschatology, her specific faith being described as "a form of Christian Science." She conducted classes in eschatology and under its doctrines administered to those who consulted her. This teaching and administration was the source of her income. The plaintiff said, "She had patients all over the United States and in Australia and Canada, and she carried on correspondence with them."

Mrs. Vera Bowen, sister-in-law of the plaintiff, served Mrs. Canaris as part-time secretary. Mrs. Bowen swore that for six to ten years Mrs. Canaris had tried to find someone who, under a promise of being rewarded with the estate upon Mrs. Canaris' death, would do her housework and become her companion. A Mrs. Larson, as a witness for the plaintiff, testified that in 1930 Mrs. Canaris told her that "if I would come and live with her until she passed away, that I would get all her property and everything she had." Mrs. Larson rejected the proposition.

Mrs. Bowen testified that in February, 1937, she suggested that the plaintiff might be willing to accept an offer of the kind which had been made to Mrs. Larson. Referring to Mrs. Canaris by the pronoun "she" and to the plaintiff by her first name "Lillian," Mrs. Bowen testified: "And so she said to me, she says, 'Well, you see Lillian,' and she says, 'You tell her because you know,' she says, 'it is the same proposition for her that it is for me.' She says, 'If Lillian comes

and if Lillian and I get along together,' she says, 'it will be just the same whoever stays with me, I will leave them the home and what I have, because,' she says, 'that would be no more than right for them taking care of me,' she says, 'I need someone with me and,' she says, 'I need a companion and,' she says, 'I need someone here in the home with me.' So then she told me to go back and so after that I called Lillian again and I says, 'There is something I want to tell you and,' I says, 'I think it is better if I come over and see you.' And I went over to the hotel and I saw Lillian.'' Mrs. Bowen communicated the offer to the plaintiff and the two testified that the plaintiff accepted it and entered Mrs. Canaris' employ March 1, 1937. The plaintiff declared that on that day Mrs. Canaris confirmed the offer that Mrs. Bowen had transmitted. From that day until the time of Mrs. Canaris' death the plaintiff remained in the home, and claims that she fully performed her part of the undertaking.

The plaintiff came to Portland in 1919 and for the next eleven years was the service manager of the Bohemian Restaurant, an establishment of considerable size. At the end of that employment she occasionally worked in restaurants, and on two other occasions, in partnership with a Mrs. Lillian M. Johnston, owned and operated restaurants. After these ventures she performed some services as a practical nurse and was so engaged when Mrs. Bowen spoke to her about Mrs. Canaris.

As already stated, the testimony of the plaintiff and of Vera Bowen supports the complaint's averment that the alleged contract of March 1, 1937, was made. The plaintiff does not claim that before that agreement was effected she inquired whether Mrs. Canaris had already

made a will, nor whether she had children or others who had a natural claim upon her bounty. If she asked concerning the extent of Mrs. Canaris' estate, she failed as a witness to mention the subject. Why she did not ask for some written evidence of the undertaking into which she and Mrs. Canaris were entering also remains undisclosed.

Mrs. Zancolli, a neighbor, swore that for five years she had known Mrs. Canaris and that "a very intimate" friendship had developed between them. She testified that ever since the plaintiff entered the employ of Mrs. Canaris the latter had displayed "a very kindly" attitude toward her, commenting in appreciative terms upon her willingness to make herself useful. She related that on more than one occasion Mrs. Canaris said concerning the plaintiff, "she would benefit by it some day" or "she will not be sorry." Referring to Mrs. Canaris' will, Mrs. Zancolli swore that "she told me and she told me she was going to change it." Further, the witness said, "She talked of it even in 1936 and 1937, she had been talking it off and on," that is, about changing her will. Mrs. Zancolli testified that in January, 1938, she accompanied Mrs. Canaris to the safety deposit vault where the latter kept her valuable papers, and that there Mrs. Canaris obtained her will, stating that she was not satisfied with it. As she walked away with her will she told the witness, "That is what I want; I want to change it."

March 15, 1938, according to Mrs. Zancolli, Mrs. Canaris displayed a new will which she thereupon signed and obtained Mrs. Zancolli's signature as an attesting witness. Mrs. Zancolli swore that this paper directed that there be sung at the testator's funeral service "In the Garden" and "The City of Four-

square," that the funeral service be conducted by a reader, and that Mrs. Canaris' two pets be given to an individual named Mrs. Stever. As further described by the witness, it contained bequests of $5 each to two nephews and a cousin of the testator, and provided that a friend, W. J. Idleman, should continue to occupy, rent free, a room in Mrs. Canaris' home. Its residuary clause was in favor of the aforementioned Mrs. Stever. Only Mrs. Zancolli and Mrs. Canaris were present when the above incident occurred, and hence a second attesting witness did not sign this purported will. Some time later, according to the witness, Mrs. Canaris "said she knowed that Mrs. Stever would carry out her wishes as she would like them, and she was satisfied that if Mrs. Stever managed it (the house) well she would have a good living from the apartment upstairs."

From the time the plaintiff had entered the employ of the Bohemian Restaurant she had been known to her friends as Miss Bowen and it was by that name that Mrs. Canaris had always referred to her. Mrs. Zancolli did not know of the above times that the plaintiff's real name was Mrs. Stever. Notwithstanding the fact that Mrs. Canaris by this paper gave her beloved pets and the residue of her estate to a Mrs. Stever, although she had many times declared, according to this witness, that Miss Bowen would be remembered for the services which she was performing, the witness did not inquire as to the identity of Mrs. Stever nor why Miss Bowen was being neglected. She testified that "it was a surprise" to her when she observed the omission of Miss Bowen's name and the provision for the supposed stranger, Mrs. Stever. Upon direct examination, she said that it was not until some days after the funeral service (which she did not attend) that she discovered

the two names applied to the same individual. We quote from her testimony: "She (plaintiff) was telling me of the undertaker asking her to sign some papers, and he says, 'Mrs. Stever, would you sign something?' and when she says, 'Mrs. Stever' I asked her who Mrs. Stever was." This same circumstance was mentioned by her three or four times, rendering it very clear that it was not until after the funeral service that she discovered the plaintiff was known not only as Miss Bowen, but also by her married name of Stever. Upon cross-examination she was asked repeatedly why she was not concerned with the fact that the will bequeathed the estate, not to Miss Bowen, but to Mrs. Stever. Finally, she said, "Well, it really wasn't such a surprise, only that I didn't want to start things." The matter was pursued with more questioning and then she was asked: "What did you mean when you said you were surprised?" and answered, "I meant when the will was made with Mrs. Stever, I knew it was Miss Bowen." This contradiction of the several answers she had given on direct examination caused the presiding judge to ask a series of questions which with the answers cover virtually four pages of transcript. Shortly the presiding judge resumed questioning concerning this contradiction; these questions and her answers cover almost six pages of transcript. Her explanation of the contradiction and of her omission to ask Mrs. Canaris why a bequest was omitted for Miss Bowen after the numerous declarations described by this witness to remember Miss Bowen, we believe, is unsatisfactory. Mrs. Zancolli admitted that before the funeral service she did not tell anyone that she had seen a new will requesting that there be sung at the funeral service "The City of Foursquare" and "In the Garden." When

asked about this omission, she said, "Yes, I knew that she wanted these songs sung, she spoke about that frequently." And later added, "No, I didn't do anything about having the songs sung at the service, I didn't have anything to do with it." While the will executed September 1, 1933, was being admitted to probate, the witness did not tell anyone that Mrs. Canaris had taken a will from her vault expressing an intention of changing it, and that later the two signed a new will. Mrs. Zancolli also swore that Mrs. Canaris was displeased with the defendant and felt that the latter was constantly seeking money from her.

The aforementioned W. J. Idleman, 90 years of age, occupied a room in Mrs. Canaris' home. According to him, "I was in the house all the time * * * I kept her books for her, her accounts, and wrote her checks for her * * * I wrote two wills for her at her request." Those wills contained no bequest for the defendant. He helped with the preparation of the will which has since been admitted to probate, and knew of no later one. Mr. Idleman knew nothing of the alleged agreement between the plaintiff and Mrs. Canaris. He swore that in October or November of 1937 Mrs. Canaris "asked me where she could get some blank forms of wills, and I told her at A. E. Kern & Company, and a few days later she came back and had two or three forms of will in her hand and said she had gotten what she wanted." He said nothing more upon the subject.

Mrs. Bowen testified that one day in January or February, 1938, when she arrived to perform her stenographic services she "started to go to the typewriter and Mrs. Canaris walked in front of me and she picked up some papers, and when she did pick up some papers I noticed she folded one she had, she had folded

it up, I could read the paper after she folded it, I could see only the outside, it was The Last Will and Testament, that is all I could read on that. Mrs. Canaris said, 'I am changing my will,' she says, 'You know there is nothing like you having your house in order.' '' She added that on two or three other occasions she saw ''those papers laying around.''

Mrs. Johnston, the aforementioned former partner of the plaintiff, testified that on March 20, 1938, while she was driving Mrs. Canaris in her automobile she pointed to a pretentious residential structure and said, ''This is the place I think Lillian and I will take for a tearoom, we want to go in business together.'' Whereupon, according to Mrs. Johnston, Mrs. Canaris replied, ''Miss Bowen doesn't have to go into business. I have taken care of her. I am going to take care of her as long as I live and then she gets the house and all that I have.'' Another time, according to Mrs. Johnston, Mrs. Canaris made substantially the same remark. A Mrs. Eivers, whose friendship with Mrs. Canaris was of long standing, testified that in May, 1938, Mrs. Canaris ''said that she liked Lillian very much, said she had been very sweet and kind to her, and she says, 'I am going to do the right thing by her.' ''

Immediately following Mrs. Canaris' death the plaintiff, with some assistance from Mrs. Johnston, began a search for a will. In pursuing the search she visited the vault where Mrs. Canaris had a box containing her valuable papers. In explanation of this search, she testified: ''She had told me before her death that she had certain requests in that will, certain songs she wanted sang and a certain reader that she wanted to conduct her services, so I told Mr. Swink of the Finley's undertaking parlor that as soon as we could get in the

box and read the will to know just what she wanted, so it was Thursday afternoon, the day before the funeral, before they could finally get together and open it, and then Mr. Andrew Lampert had came out and told me that there was no will in the box down there.''

Apart from the testimony of some of the above witnesses that Mrs. Canaris was not on affectionate terms with her relatives, was displeased with the defendant, felt that the latter was always asking for money, and that the visits to her home by the defendant's daughter and granddaughter made Mrs. Canaris nervous, the above is a substantial review of all the evidence submitted by the plaintiff in support of her claim. Details, of course, have been omitted.

We shall now give a brief review of the evidence presented by the defendant. A Mrs. Glasoe, 55 years of age, had known Mrs. Canaris all of her life; her mother and Mrs. Canaris were girls together and had been friends ever since. She said that although she had seen the defendant only occasionally she felt that for 35 years she had known her well through hearing Mrs. Canaris talk about her in endearing terms, and ''because she hardly ever got a letter from Pearl but what she called me up, probably to tell me about it.'' She described Mrs. Canaris' attitude towards the defendant as that of a mother to a daughter. Upon one occasion, according to this witness, Mrs. Canaris, referring to the defendant, said: ''I love that girl and she is just like my very own.'' At another time, so she said, Mrs. Canaris ''told me about her baby passing and Pearl was the only one that fit in her heart and those things, and it impressed me very decidedly.''

The defendant testified that ever since she was a little girl, that is, for 54 years, she had known Mrs.

Canaris. When she entered grammar school she made her home with Mrs. Canaris. Her mother, who was 83 years old at the time of the trial, and Mrs. Canaris had been intimate friends before the defendant's birth and remained such until Mrs. Canaris' death. When the defendant was a young woman she lived for a while in Mrs. Canaris' home and the two at that time had employment in the same establishment. In 1904 the defendant was married in Mrs. Canaris' home. Both the defendant and her aunt testified that Mrs. Canaris treated the defendant as though she were her daughter.

In 1906 the defendant moved to Baker and has resided there ever since. Her husband has been in very poor health for the past 11 years and in that time has not worked. In the meantime, the defendant has followed the occupation of a dressmaker and has evidently become the principal source of support for her family. During her residence in Baker she corresponded regularly with Mrs. Canaris and the two occasionally exchanged visits. Some of Mrs. Canaris' last letters to the defendant were received as evidence. They are encouched in endearing terms. The defendant, who is the mother of children, described Mrs. Canaris' attitude toward them as follows: "She was always very fond of them. She was like a grandmother to them." The defendant's daughter lives in Portland and is the mother of a child. Mrs. Canaris has shown much affection for the child. The defendant swore that upon many occasions over an extended period of time Mrs. Canaris had told her that "I will be remembered." She, however, declared that she did not know that the decedent had ever made a will.

Mrs. Glasoe described a visit which Mrs. Canaris made to her home about four years ago when Mrs.

Glasoe's mother was there. Upon that occasion Mrs. Glasoe's mother, addressing Mrs. Canaris as Katie, said: " 'Oh, Katie, I have my house in order, I am so happy.' And Mrs. Canaris said to Mother, 'I have my house in order, too, I have left everything to Pearl.' Mother says, 'I am so happy.' She says, I am so happy, it won't be long until I am ninety.' She says, 'I have my house in order, Katie.' She always called her Katie. And Mrs. Canaris said, 'I have my house in order, too.' And it is the first time I heard her talk about a will, and she says, 'I have left everything to Pearl.' Then they talked on." She described an incident which she said took place April 19, about a month before Mrs. Canaris' death. At that time the two went to a theater, but, arriving before the doors were open, visited for a while in a refreshment place. We now quote a part of her testimony which reports what was said upon that occasion: " * * * and she was so impressed about Mother, she was going to be ninety soon, and she talked about her and she said, 'Mamma was so happy that she had fixed her house all up' and she says, 'I was happy I could tell her I had fixed mine too,' and I said, 'Is it the same?' I always called her Katie. I says, 'Is it the same? You haven't changed it, is it the same as it was? You have left everything to Pearl?' and she says, 'Yes.' And she told Mother this, she told me twice then, this time and the other time, that she would never forget Pearl. When she was in the pickle factory she was sick, she wasn't able to work, she wasn't able to work, and she went to Baker to visit Pearl Holt and she was there a few months and she came back well, and she says, 'Pearl gave me money and I got on my feet again, and I will never forget Pearl for it.' That is how she happened to mention her will." Upon another occasion,

according to Mrs. Glasoe, Mrs. Canaris expressed herself as irked or annoyed by the plaintiff, saying, ''I don't like that woman * * * I tried to get Zena * * *. She is a person who would have no influence over anybody.''

Other testimony indicates that Mrs. Canaris had affection for the defendant. For instance, a Mrs. Purdy, a neighbor, testified: ''She (Mrs. Canaris) said that her mother had been her closest friend and her daughter was like a daughter to her,'' that is, to Mrs. Canaris. This witness and Mrs. Glasoe have no interest whatever in the outcome of this suit. They are related to none of the parties and are unaffected by the terms of the will. The day before Mrs. Canaris' death the defendant and her mother arrived in Portland from Baker on their way to Seattle. Immediately upon their arrival in Portland they went to Mrs. Canaris' home and were her guests that night and the next day. According to the defendant and her daughter, who was present an hour or so during the visit, Mrs. Canaris displayed her accustomed affection. The plaintiff, Mrs. Zancolli and Mr. Idleman testified that when Mrs. Canaris heard that the defendant and her mother expected to make this visit she became agitated and showed displeasure. However, two postal cards, which Mrs. Canaris sent to the defendant upon hearing of the contemplated visit, are couched in cordial language and express anticipation of pleasure. They are out of harmony with the testimony of those three witnesses.

We have mentioned the fact that immediately after the death the plaintiff instituted a search through Mrs. Canaris' belongings for the purpose of endeavoring to find a will. At that time she and the aforementioned W. J. Idleman were the only occupants of the house,

with the exception of Mrs. Johnston who, at the plaintiff's request, stayed with her for two weeks following the death. The plaintiff testified that due to the many friends of Mrs. Canaris who telephoned or made personal calls following the death she lacked the opportunity of making a thorough search. However, on Saturday, May 28, (the death occurred Tuesday, May 24,) the plaintiff found the will which has been admitted to probate. She claims that she found it in a carton alongside a desk which Mrs. Canaris had used during her lifetime. This carton, according to the plaintiff, served Mrs. Canaris as a wastepaper basket and at the time of the finding held many discarded papers. Upon finding the will she showed it to W. J. Idleman and after both had read it he summoned his brother, C. M. Idleman, an attorney, who three days later offered it for probate. Mrs. Johnston drove the plaintiff, W. J. Idleman and others to the courthouse on the day the will was presented. The plaintiff and Mrs. Johnston remained outside of the courthouse while the will was being probated. They knew what was taking place, but offered no protest.

As we have just said, C. M. Idleman, upon being summoned by his brother, went to the Canaris home (Saturday, May 28,) and was then shown the will that had just been discovered. According to the plaintiff, "As soon as he came in I told him that Mrs. Canaris had promised to leave me everything." That testimony was corroborated by W. J. Idleman, but C. M. Idleman positively denied that the plaintiff ever told him of any promise made by Mrs. Canaris to devise anything to the plaintiff.

The plaintiff and W. J. Idleman swore that after the former had told C. M. Idleman of the alleged promise of

Mrs. Canaris to bequeath her estate to the plaintiff, and had also told him that the plaintiff had never received any pay for her services, the attorney advised her to file a claim against the estate for their value. Mr. Idleman who has had a distinguished career at the bar and who, notwithstanding his age of 86 years, is still active in his profession, swore that to the best of his recollection he had heard nothing about the plaintiff's claim for unpaid services until after the funeral when she showed him a statement which she had prepared indicating that Mrs. Canaris was indebted to her in the sum of $525 for 15 months' services. That statement, written in the plaintiff's handwriting, became one of the exhibits in this case. A copy follows:

"May 31st, 1938.

To Lillian Bowen Stever,

For services rendered to the late Mrs. Catharine Canaris from March 1st, 1937, to June 1st, 1938, at $35.00 per month (15 mo.) ........................$525.00

Approved by   *   *   *"

After this statement had been prepared and the plaintiff had explained to the defendant that she had never received anything for her work, the defendant wrote her signature after the words "Approved by." Mr. Idleman said that when the plaintiff showed this statement of account to him he told her that she ought to have an attorney prepare it in proper form for presentation to the estate's representative. When Mrs. Johnston saw the statement she told the plaintiff that it lacked formality and that she ought to consult an attorney. Either as a result of this suggestion or of Mr. Idleman's advice, the plaintiff repaired to the office of W. A. Carter, an attorney of wide experience, and after showing him the statement of account, asked him to draft it

in proper form. The plaintiff admits, and Mr. Carter swore, that at that time the former said nothing concerning her claim to the entire estate. From the claim prepared by Mr. Carter we take the following:

"Mrs. Pearl Holt, Administratrix of the Estate of Catherine Canaris    *    *    *
                    to
                Lillian Bowen Stever, Dr.
    To services, care and nursing from
        Mar. 1/37 to June 1/38
        15 Months at $35.00 a month _____$525.00"

This statement accompanied the affidavit of the plaintiff which verified her claim. The affidavit declared that the estate was indebted to the plaintiff in the amount of $525 "upon an account for services in care and nursing." This claim was handed to Mr. C. M. Idleman who transmitted it to the defendant at Baker with the advice that it be rejected until he could investigate its merits. It was rejected and thereupon this suit was instituted.

We shall now resume mention of the evidence which indicates what transpired during the search for the will. It will be recalled that the funeral was held Friday, May 27, and that on Saturday, May 28, the plaintiff found the will which was shortly admitted to probate. The discovery of that will, however, did not cause the plaintiff to discontinue her search. The continued search produced no other testamentary document. Since the will which was executed September 1, 1933, nominated the defendant as executrix of the estate, she was appointed to that office. The following two days (June 1 and 2) she examined Mrs. Canaris' papers for the purpose of ascertaining whether a later will existed. During her search W. J. Idleman, the plaintiff and Mrs.

Johnston were in the house and it is evident that the latter two did not omit watching her movements. The defendant claimed that she was prompted to make a search because of the plaintiff's inquiries to many people whether they knew of a later will. She found none, and on June 2, at 5:00 o'clock in the afternoon, left the home. The plaintiff's brief contains intimations that, although the searches yielded nothing, a later revoking will may nevertheless lurk somewhere in the house. However, we observe that the complaint says: "On or about September 1, 1933, Catharine Canaris executed a document which was then intended to be and was her last will and testament." Thus, the complaint itself sets at rest an issue upon which much time was spent at the trial. The will of September 1, 1933, was Mrs. Canaris' last will and testament. The quoted language so says. Therefore, there was no later will.

At the time of the trial the plaintiff was still living in the home, now, however, as housekeeper for W. J. Idleman who occupies the house as a tenant. According to the witnesses, Mrs. Canaris was a woman of good character who could be depended upon to make good her word. In the transaction of her affairs she was careful and thorough. This completes our review of the evidence.

Lest we be accused of having overlooked details and minor incidents described by the witnesses, but not mentioned in the preceding paragraphs, we state that we have studied the entire transcript of the evidence with care. We believe that we have mentioned every fact that possesses importance.

The question now occurs, did Mrs. Canaris and the plaintiff make the alleged contract of March 1, 1937.

Section 9-904, Oregon Code 1930, says:

"A written will can not be revoked or altered otherwise than by another written will, or another writing of the testator * * *; or unless the will be burnt, torn, canceled * * * with the intent and for the purpose of revoking the same * * *."

No method of revocation authorized by our laws was employed by the deceased, and hence the will of September 1, 1933, was still in force at the time of her death; or, as the complaint states, it "was her last will and testament." The issue, therefore, is whether or not she possessed any property at the time of her death upon which the will could operate. The plaintiff claims that she did not, saying that the alleged contract of March 1, 1937, gave the entire estate to the plaintiff. The will of September 1, 1933, expressly mentioned Mrs. Canaris' home, and devised it to the defendant "on the condition that the said Pearl Holt move into and make her home in the above-mentioned house and provide and care for the little dog Beauty and the cat Cutey." If the alleged contract of March 1, 1937, was actually made, this provision for the disposition of the home and care for the pets, which Mrs. Canaris must have deemed important, is defeated.

■ Suits to establish contracts of the kind now before us are viewed with suspicion and distrust, not only by the layman but also by the courts. The proof required for their establishment must be clear and satisfactory: *Harris v. Craven*, 162 Or. 1, 91 P. (2d) 302, and *Losey v. O'Hair*, 160 Or. 63, 83 P. (2d) 493. This must be especially true where the oral contract, if established, will in effect revoke a duly executed will. Let us now determine whether the evidence indicates that the alleged contract was made.

In determining whether or not we ought to believe that the plaintiff entered into the contract described in her complaint, we believe that importance should be attached to the fact that she was alert, intelligent and had had extensive business experience. We do not believe that such a person would agree to work for another for the uncertain period of the latter's life under a contract to be compensated with an estate without asking (a) the size of the estate; (b) its indebtedness, if any; (c) its earning capacity; (d) for some sort of written evidence of the agreement; (e) whether the other contracting party has any relatives or dependents who will naturally expect to be remembered; (f) whether a will has already been executed; and (g) whether the other contracting party owes accounts, etc., which will be a charge upon the property. Possibly all of those questions would not be asked, but the failure to ask any of them in the present instance is inconsistent with the plaintiff's past business experience and with the fact that this contract might have exacted of the plaintiff many years of toil, yielding her, in the meantime, not one cent of income.

Again, if the story told by the plaintiff upon direct examination is true, the following facts are inconsistent with it: (1) she permitted, without protest, a will to be probated which she at that time thought had been revoked and which she now claims could affect no estate whatever; (2) she filed the claims for compensation, one prepared by her own pen and the other by her attorney, thus conceding that the estate was not hers (*Harris v. Craven,* supra); (3) she failed to tell her attorney of the alleged agreement when she first consulted him and postponed telling him about it for more than a month; (4) she accepted the aforementioned em-

ployment from W. J. Idleman which brought her $10 per month, a circumstance inconsistent with her contention that she had a contract which required her to give Mrs. Canaris all of her time; and (5) she sat mute in an automobile outside of the courthouse when the will of September 1, 1933, was being presented for probate, which she now says she recovered from the litter of a wastepaper basket.

All of the testimony submitted by the plaintiff clashes head-on with the evidence which shows that the deceased (a) for years had regarded the defendant as a daughter and had planned "to remember" her; and (b) left unrevoked a will which carried into effect that plan.

While the plaintiff's complaint is not without support, we are convinced that the supporting evidence does not possess the required degree of cogency.

The decree of the circuit court is affirmed. Costs and disbursements will not be allowed.

RAND, C. J., and KELLY, BELT, BAILEY and LUSK, JJ., concur.