Argued January 26; reversed February 23, 1944

# BOOHER *v.* BROWN

(146 P. (2d) 71)

Before BAILEY, Chief Justice, and ROSSMAN, LUSK, BRAND and HAY, Associate Justices.

*John D. Williams* and *Paul C. King,* both of Portland, for appellant.

*Francis F. Yunker,* of Portland, for respondent.

HAY, J.

Peter Callan and Mary E. Callan, his wife, in their lifetime, owned, as tenants by the entirety, a house and lot in a suburban district in the city of Portland. Mr. Callan died on May 19, 1940. The plaintiff herein, Marian Booher, was Peter Callan's sister. She is a widow, aged sixty-four years, and resides at St. Paul, Minnesota. Mrs. Callan died intestate in November, 1941. The defendant, Catherine Brown, was Mrs. Callan's sister, is her sole heir at law, and is also administratrix of her estate.

The complaint alleged that Mrs. Callan, about June 15, 1941, being in poor health, entered into a contract with the plaintiff, by which the latter agreed to leave her home in Minnesota and go to Portland to live with and care for the former for the remainder

of Mrs. Callan's life, in consideration whereof Mrs. Callan agreed to "grant and bequeath" to plaintiff her home property above referred to; that plaintiff fully performed such contract, but that Mrs. Callan failed to perform her part thereof. Plaintiff seeks specific performance of the alleged contract. The answer is a general denial, with an affirmative defense to the effect that plaintiff, in the year 1941, claimed that she owned the Callan property under the will of her brother, Peter Callan, but would permit Mrs. Callan to. live on the property for the remainder of her life; that, at no time prior to Mrs. Callan's death, did plaintiff ever assert the existence of the contract mentioned in her complaint; and that, if there was such a contract, it was procured by false and fraudulent representations by plaintiff to Mrs. Callan respecting plaintiff's alleged ownership of the property under Mr. Callan's will. A hearing was had, and the trial court rendered its decision in favor of the plaintiff. The defendant appealed.

■■ A contract of the sort under consideration may be enforced in equity. To justify such enforcement, however, the plaintiff must, by clear and convincing evidence, establish the existence of the contract, and the fact that it was definite, certain and reasonable in its terms. *Richardson v. Orth,* 40 Or. 252, 66 P. 925; *Hawkins v. Doe,* 60 Or. 437, 119 P. 754, Ann. Cas. 1914A, 765; *Mathews v. Tobias,* 101 Or. 605, 201 P. 199; *Brennen v. Derby,* 124 Or. 574, 265 P. 425; *Losey v. O'Hair,* 160 Or. 63, 83 P. (2d) 493; *Harris v. Craven,* 162, Or. 1, 91 P. (2d) 302; *Stever v. Holt,* 164 Or. 195, 100 P. (2d) 1016.

The present suit is based upon an alleged contract in writing, contained in written memoranda in the form

of letters which passed between the deceased Mrs. Callan and plaintiff. Mrs. Callan's letters, presumably, were signed by her. The principal questions before this court are whether or not the alleged contract was established by proof, and, if so, whether it was substantially performed by the plaintiff.

Mrs. Booher testified that, after the death of her brother, Peter Callan, Mrs. Callan sent letters to her in which she stated that she wanted Mrs. Booher to go to Portland; that she was pretty sick and had diabetes. She answered, saying that it was impossible for her to go at that time, and advising Mrs. Callan to get some one else to care for her until she could go. Several letters passed between them, and Mrs. Callan finally wrote that she would send Mrs. Booher some money if she did not have enough for her fare. "She told me," she testified, "if I would take care of her in the last letter she would compensate me with the home."

In June, 1941, plaintiff left St. Paul and traveled to Portland. She went immediately to the Callan home, and says that she found Mrs. Callan in very bad condition. She had had a fall, and was "all bruised" and had sores on her face. She appeared to be suffering from malnutrition, and weighed only seventy pounds. Mrs. Booher says that she took care of Mrs. Callan from that time until she died, a period of about five months, feeding, nourishing [nursing?] and bathing her. She also did the housework. She said that Mrs. Callan improved remarkably under her ministrations, and toward the last was "getting along splendidly".

After Mrs. Booher came to Portland, she testified, nothing was said between her and Mrs. Callan with reference to the disposition of the property. However, "all of a sudden", about a month before she died, Mrs.

Callan said that she would like to have Mr. Francis F. Yunker, an attorney, come to her home, as she wanted to talk with him about making her will. There were certain things she wanted to leave to her sister, "and then she wanted me to take care of everything". Mrs. Callan was not "satisfied with the way she wanted those wills drawn up. She kept changing her mind about leaving different little things to her sister and her family". Three different wills were drawn by Mr. Yunker, Mrs. Booher said, but none was signed, and Mrs. Callan died intestate. Mrs. Booher returned to St. Paul after Mrs. Callan's death, and resumed her vocation as a practical nurse.

Mr. J. H. Butterfield, a friend and neighbor of Mrs. Callan's, sent plaintiff $20 to help defray her bus fare in going to Portland. He did this as a loan to Mrs. Callan, to save her from the trouble of making a trip to the bank to get the money. We quote a portion of a letter which he wrote to plaintiff, under date of March 18, 1941:

"* * * I was not there only a short time when she said she had received a letter from you, and she went and got it and read it to me as I did not have my glasses.

"I had quite a talk with her and she seems to think that anything could happen, and also she seems to know that you are sincere in the matter in coming out and staying with her, she has her $30.00 a month Pension and I do not think she has any tax to pay. Pete was exempt and she may be, so she does not have but very little expense. She may have a little money besides her Pension but this we do not know, probably not much. She makes out to get her work done, but is of course slow, but practically has plenty of time to do it, as she stays in kitchen mostly. She is comfortable and all

that but not in a position to be living alone; I told her if she got bad or fell and broke her arm or anything she would be there all alone and she concluded it was not safe, but she has lots of grit, and does not feel she should call on anyone, only us people.

"She wanted me to write you and tell you that she wanted you to come it was O.K. * * *"

The evidence indicates that Mrs. Callan was far from being a helpless invalid. On the contrary, she seems to have been a spry old lady, active and energetic. She was in the habit of arising around six o'clock in the morning, and did most of her own marketing, walking, for that purpose, a distance of ten city blocks. She continued this practice up to within about one week of her death. She carried her groceries home if the load was not too heavy. There was evidence that she "took her own bath and went to the table, and everything like that". Mrs. Booher testified that, during the time she lived with Mrs. Callan, she was not allowed to leave her, and never did leave her for a moment. She admitted, however, that Mrs. Callan made trips to the grocery store, but said that she "watched her" from the front of the house. Taking care of Mrs. Callan, she said, consumed practically twenty-four hours a day. She had to get out of bed several times during the night to attend her. She agreed that in practical nursing this was not unusual. Some patients, however, sleep all night, she said, whereas Mrs. Callan would get up and wander around, which required Mrs. Booher to be on the alert. As a matter of fact, Mrs. Callan came to her death through her own activity and restlessness. She arose from her bed, without Mrs. Booher's knowledge, at about five o'clock in the morning, and, in going down to the basement for the purpose of lighting a fire in

the furnace, fell on the basement stairs, receiving injuries as a result of which she died a few days later.

Prior to her going to Portland in 1941, the relationship between Mrs. Booher and Mrs. Callan had never been particularly close, and one witness testified that they did not get along any too well while they lived together, saying: "They *fit* every time I was there. * * * With their mouths."

The defendant, Mrs. Catherine Brown, was Mrs. Callan's only sister. She lived in Portland, but her home was about six or seven miles from Mrs. Callan's. They visited each other about once a month, but she was unable to give Mrs. Callan much attention, because of the fact that she had her own family to care for, including a husband with a broken leg. She did, however, endeavor to get Mrs. Callan to take a room in an old people's home, which was quite near Mrs. Brown's residence, so that she might be able to watch over her to some extent. Mrs. Callan, however, said she preferred to live alone. She wanted to stay in her own home, where she could keep her little dog, to which she was very much attached. The relationship between Mrs. Callan and Mrs. Brown was cordial and affectionate.

Two friends of Mrs. Callan's testified that she told them that Mrs. Booher was coming to take care of her, and that she would give her the home. On the other hand, two other persons, who were perhaps her nearest neighbors, and who, according to the evidence, did for her more neighborly acts of kindness than anyone else, testified that Mrs. Callan told them, weeping, that she had received a letter from Mrs. Booher, and that she was coming to "put her out of the house", claiming that she owned the property through Peter Callan's will.

These witnesses said, moreover, that Mrs. Booher told them, in their home, in the summer of 1941, that she owned the Callan property through her brother's will, that she did not think that Mrs. Callan would live long, and that she (Mrs. Callan) could stay in the house until she passed away. Later, shortly before Mrs. Callan died, Mrs. Booher told one of these witnesses that Mrs. Callan was so much better that she thought she would go back home. Another neighbor and close friend testified that Mrs. Callan told her also about receiving such a letter from Mrs. Booher, as above mentioned, saying: "Dolly [Mrs. Booher] says here in the letter that she is coming to take the property and I am to look for another place or get out." This witness said she was "awfully sorry for Mrs. Callan, the way she was so upset".

A most peculiar incident connected with this case is that Peter Callan, ten years before he died, signed a document intended to operate as a will, devising to Mrs. Booher a two-thirds interest in the Callan home property. The other one-third he devised to Mrs. Callan. This instrument, furthermore, bequeathed to Mrs. Booher "such of the furniture as she may desire to take", and to Mrs. Callan "such of the personal property as is left after my sister takes her share of the same". No reason is disclosed by the evidence why he should thus have attempted to prefer his sister to his wife. The Callans had been living together as man and wife for many years. The property was undoubtedly the fruits of their joint labors. They had no children, and, as Mrs. Booher herself testified, their relationship was pleasant. Mrs. Booher had just returned home to St. Paul after spending some time visiting the Callans, and the will was sent to her by Mr. Callan by mail. She was perfectly aware that its provisions were

unfair to Mrs. Callan, and wrote her brother that she "did not think it was right". However, she kept the will. She testified that a Minnesota attorney had advised her that it would not be valid under the laws of that state. She brought it with her to Oregon in 1941, and consulted an Oregon attorney as to whether or not it would be valid here. It was ineffectual, of course, as to the real property, which the Callans held as tenants by the entirety. Moreover, it was invalid as to formality under our law, as it was attested by only one witness— the attorney who drew it, (not, however, any of the attorneys in the case at bar).

 Carbon copies of two wills, one dated September and the other October, 1941, were marked for identification, but apparently were neither offered nor received in evidence, although marked "Recd." On the hearing, plaintiff offered to prove by her attorney, Mr. Francis Yunker, that he had been called in by Mrs. Callan and instructed to draw a will for her; that he prepared two wills, each in accordance with her directions; that she signed neither of them, and that she finally gave him a written memorandum (which is in evidence), setting forth articles of personal property which she desired to bequeath to her sister and to her niece, but that before another will, embodying such bequests, could be drawn, she died. The defendant objected to such offer, on the ground that it involved disclosure of privileged communications, which objection the court sustained. Although (probably through oversight) the unsigned wills were not offered in evidence, we assume that the purpose of the proffered testimony was to show that, in causing them to be prepared, Mrs. Callan evidenced an intention to carry out her part of the alleged contract between her and the plaintiff, and hence, indirectly, to prove the existence of the contract.

It is in this respect only that the testimony would have been relevant to the issues. (Whether or not it would have been competent is a question which is not before us.) Respondent contends that, in drawing these wills, Mr. Yunker acted as a mere scrivener. It does not appear that he was consulted, or gave advice, in relation to the effect of the instruments which he drafted upon the alleged contractual relationship between Mrs. Callan and Mrs. Booher. If he had been a mere scrivener, the communications to him would not have been privileged. *Sitton v. Peyree,* 117 Or. 107, 241 P. 62. We think, however, that he was more than a scrivener. Surely, no attorney at law, who is called in to draft so important a document as a will, by and for an elderly woman of no experience in either business or legal affairs, would fail to inform himself, at the least, upon the competency of the proposed testator, the extent of her property, the "natural objects of her bounty", and similar matters with which a mere scrivener would have nothing to do. While both the evidence and the offer of proof are vague upon those points, we feel that, in the light of all the circumstances and of the evident purpose of the proffered testimony, the relationship of attorney and client was manifest.

The wills not having been executed by Mrs. Callan, we are of the opinion that the court correctly ruled that the communications were privileged. If they had been duly executed and published, no doubt the privilege would have been waived, and the attorney might have been permitted to testify. 28 R. C. L., Witnesses, section 150.

It is to be observed, in this case, moreover, that Mr. Yunker was not only attorney for Mrs. Callan, but that he was also attorney for Mrs. Booher, the proposed principal beneficiary under the instruments

which he prepared. He is Mrs. Booher's attorney in the case at bar, and was offered, it would seem, as a partisan witness to sustain his client's claim in the premises. These facts, in our opinion, tend to emphasize the propriety of the court's ruling. 5 Jones on Evidence, 2d ed., section 2163, p. 4108.

Plaintiff says that, before leaving St. Paul to go to Portland, she burned Mrs. Callan's letters to her, because she did not think it necessary to keep them. After coming to Portland, and while house cleaning in Mrs. Callan's home, she burned the letters that she wrote to Mrs. Callan. This she did, she said, at Mrs. Callan's request, who had preserved letters which she had received over a period of about twenty years, and said that she wanted to get rid of them. The trial court permitted plaintiff to give oral testimony of the contents of the letters.

■■ The wilful destruction of documentary evidence raises an unfavorable presumption against the party who destroyed it. 1 Jones on Evidence, 1st ed., section 22 (19), p. 136. If, however, the evidence was destroyed under circumstances which free the party from suspicion of intentional fraud, and, if he was without neglect or default in the premises, then secondary evidence is properly admissible. 20 Am. Jur., Evidence, section 438; 1 Jones on Evidence, 1st ed., section 21 (18), p. 133; id., section 18 (16); section 2-212 (2), O. C. L. A. Before admitting such secondary evidence, however, the court should be satisfied that every inference of fraud has been overcome. 2 Jones on Evidence, 2d ed., section 826, p. 1512.

■ The trial judge, in his memorandum opinion, said that he was very favorably impressed with the conduct and demeanor of the plaintiff while on the witness-stand. No doubt she made an excellent witness,

and, ordinarily, we should defer to the judgment of the trial judge in this connection. After careful consideration of all the evidence, however, we are not satisfied that the plaintiff overcame the inference which arose from her destruction of the written evidence upon which she relied. That inference is that, if the letters had been produced, they would have been unfavorable to her contentions as to the existence of the alleged contract. *Russell v. Bush,* 196 Ala. 309, 71 So. 397; *"The Count Joannes" v. Bennett,* 5 Allen (Mass.) 169, 81 Am. Dec. 738; *In re Kelly's Estate,* 150 Or. 598, 46 P. (2d) 84; *Smith v. Dunn,* 165 Or. 418, 107 P. (2d) 985. It is indeed strange that, of all the documentary evidence in the case, Mrs. Booher should have preserved only the Peter Callan will and the Butterfield letter. The reason why she preserved the will is obvious, we think, as she consulted an attorney as to its validity during the very period when, as she contends, she was performing a contract under which the Callan realty was to be devised to her. We do not think that the Butterfield letter tends to prove the alleged contract. Mr. Butterfield did indeed testify that, when Mrs. Callan asked him to write Mrs. Booher, she said: "Dolly will come out here and when I am gone she gets what is left." This, however, does not prove the existence of the contract as alleged, under which the real property, and not "what was left", was to be devised to her.

Whatever may be said of her act in destroying Mrs. Callan's letters to her, we are not satisfied by Mrs. Booher's explanation respecting her burning of her own letters to Mrs. Callan. Mrs. Callan was an old woman, who had carefully preserved all the letters which she had received in twenty years, and we think

it is unlikely that she should have suddenly resolved to burn them. It is true that, when Mrs. Booher burned the letters, the evidence does not indicate that she contemplated becoming involved in a lawsuit. Why then, in her zeal for house cleaning, did she not burn the Butterfield letter also? Why, for that matter, did she cling to the Peter Callan will, which, she says, she knew to be worthless? We can see no reason to doubt the testimony of witnesses to whom she stated that she was the owner of the property by virtue of that will, which statements are in harmony with the fact that she preserved it for ten years, brought it to Oregon, and sought an Oregon attorney's advice respecting its validity. They are also in harmony with her statements that she did not think that Mrs. Callan would live long, and that she might occupy the home until she passed away. These matters were testified to by reputable and disinterested witnesses, and we cannot ignore them.

■ In our opinion, the alleged contract was not established by clear and convincing proof, and the plaintiff failed to make a case entitling her to equitable relief. She undoubtedly performed some services for Mrs. Callan, and, upon a proper showing in a proper forum, may be entitled to recover what such services were reasonably worth, including reasonable compensation for the time spent and the expense involved in necessary travel. Her remedy, however, is to follow the statutory procedure of lodging a creditor's claim against Mrs. Callan's estate.

The decree of the trial court is reversed, and the cause will be dismissed, without prejudice to Mrs. Booher's pursuing her statutory remedy. No costs will be allowed to either party.