Argued March 12, affirmed April 2, 1952

# HAWKINS *v.* TOOMBS, EXECUTOR, ET AL.

242 P. 2d 194

*William B. Murray,* of Portland, argued the cause and filed briefs for appellant.

*William J. Crawford,* of Portland, argued the cause for respondents. With him on the brief was Emerson U. Sims, of Portland.

Before BRAND, Chief Justice, and HAY, LUSK, WARNER and TOOZE, Justices.

WARNER, J.

This suit was brought by the plaintiff, Mayme Hawkins, against the defendants, Chester L. Toombs, as executor of the estate of George E. Herrmann (sometimes incorrectly spelled "Herrman"), deceased, and the said Toombs and his wife, Elsie, in their capacity as devisees under the last will and testament of that decedent, for specific performance of an alleged contract between the plaintiff and her deceased husband, Harry E. Hawkins, and the decedent, George E. Herrmann, and his deceased wife wherein the survivor of the Herrmanns agreed to devise to the survivor of the Hawkinses his undivided one-half interest in a parcel of residential property in Portland, Oregon. From a decree in favor of the defendants, the plaintiff appeals.

George E. Herrmann died testate on January 16, 1949. His wife, Mary Herrmann, died in 1945. The

plaintiff is the stepdaughter of the former and daughter of his deceased wife, Mary. In September, 1910, the Herrmanns purchased the subject property for the sum of $1,500 with funds belonging to Mary Herrmann, taking the title in their names as tenants by the entirety. It is the contention of the plaintiff that this was done pursuant to an oral agreement made earlier in 1910 between the Herrmanns and the Hawkinses whereby the Herrmanns would purchase the lot and the Hawkinses would build a house thereon to be financed by a mortgage on the property to be paid by the Hawkinses. According to plaintiff, the Hawkinses were also to repay Mrs. Herrmann for the $1,500 she laid out on the purchase price of the lot.

The record shows that on September 30, 1910, the sum of $2,300 was deposited with Ashley & Rumelin, Bankers, of Portland to the credit of "Herman [sic] & Hawkins Building Fund." The duplicate deposit slip evidencing this transaction bears an endorsement of the bank's cashier reading: "To be paid out for construction of House on Lot 15 Block 118 Irvington [the subject property] when bills are O.K. by H. E. Hawkins." Mrs. Hawkins states that this deposit came from a mortgage loan made through the bank. Whether accomplished on the credit of the Herrmanns alone or the Herrmanns and the Hawkinses together, the record is silent. Plaintiff also claims that the Hawkinses advanced an additional $1,000 from their own savings for the construction costs. As represented by plaintiff, the total investment in the property as of 1910 was approximately $4,800, $3,800 of which the Hawkinses owed to the Herrmanns.

Some time in November, 1910, the Hawkinses took possession of the property and furnished it. Two months later the Herrmanns moved in, and the two

families shared the same until the Hawkinses went elsewhere to live in November, 1919. Most of the time after leaving the Herrmann household, they resided in Yakima, Washington. Mr. and Mrs. Herrmann lived in the home by themselves until Mrs. Herrmann's death in 1945 and Mr. Herrmann thereafter until his death in 1949. On December 16, 1945, Mr. and Mrs. Hawkins returned and resumed their residence in the house with Mrs. Hawkins' stepfather and continued this arrangement up to the time of his death. Mrs. Hawkins' husband died in November, 1946.

On April 21, 1917, the Herrmanns gave a mortgage on the property to one August Noffke to secure the payment of a note for $1,750, payable five years after that date. The note was signed by the Herrmanns alone.

The year 1927 is one of significant interest in the transactions between the Hawkins and Herrmann families. The plaintiff claims that she and her husband had made all the payments on the bank mortgage and thereafter "made periodic payments on said mortgage [the mortgage to Noffke] and street assessment until the same was paid off in full in October of 1927." On December 16, 1927, the plaintiff asserts, the Herrmanns proposed an oral modification of the agreement of 1910 which was orally accepted by the Hawkinses. The essence of this alleged modification was that the Herrmanns would then deed to the Hawkinses, as tenants by the entirety, an undivided one-half interest in the subject property and agree that the surviving Herrmann spouse would devise the remaining one-half interest to the Hawkinses in the same tenancy as provided in the deed. It is the purported agreement of 1910 as so modified in 1927 that the plaintiff here seeks to enforce.

In July, 1947, Mr. Herrmann executed his last will and testament wherein he devised to his neighbors, the defendants Chester L. Toombs and Elsie Toombs, his wife, his undivided one-half interest in the property in controversy. His will also nominated Mr. Toombs as his executor. The third article of the will contained this statement:

"Whereas, I have no living relatives, except a Sister, Mrs. Lilly Leeman, of Oberhofen, Thun, Switzerland, and who is now of the approximate age of 77 years, and a Step-daughter, Mayme Hawkins, who is at present residing at 2408 N. E. 7th Avenue, Portland, Oregon, and who is of the age of 64 years, and it being my desire that they take nothing from my estate, I, therefore, direct that they are to receive nothing. This I particularly do, in the case of my Step-daughter, Mayme Hawkins, as she has persistantly [sic] since the death of my Son-in-law, Harry E. Hawkins, been very quarrelsome, dictatorial, non-cooperative, and otherwise mistreated me. I am also informed that she has told neighbors that I have promised upon my death to leave her my estate. This is wholly untrue. My deceased wife, Mary Herrmann, and myself, did however, execute a deed of conveyance to Harry E. Hawkins and Mayme Hawkins, husband and wife, conveying an undivided one-half (½) interest in and to Lot 15, Block 118, IRVINGTON, Portland, Multnomah County, Oregon, which deed was executed on October 19, 1927, and which was recorded on November 21, 1927, in Deed Book 1128, at Page 145, Deed Records of Multnomah County, Oregon, but retained an un-divided interest in ourselves. Mayme Hawkins and myself have lived in the same household, and I have paid out of my pension one-half of the cost of the household and other expenses, and I have paid all of the taxes due upon the above described real property; that I have tolerated her mistreatment of me, only by reason of the fact that she was the child of my deceased wife."

■ Suits to establish oral contracts to devise real property are viewed with suspicion and distrust. *Benson v. Williams,* 174 Or 404, 434, 143 P2d 477, 149 P2d 549; *Stever v. Holt,* 164 Or 195, 212, 100 P2d 1016. To justify specific enforcement of a contract of that character, the plaintiff must, by clear and convincing evidence, not only establish the existence of the contract but also the fact that it was definite, certain and reasonable in its terms. *Tiggelbeck v. Russell et al.,* 187 Or 554, 561, 213 P2d 156; *Perez v. Potier,* 179 Or 123, 150, 170 P2d 343; *Booher v. Brown,* 173 Or 464, 466,·146 P2d 71, and cases there cited. These salutary rules are especially applicable when an oral contract, if established, will in effect revoke or defeat the testamentary pattern of a duly executed will. *Stever v. Holt,* supra. The reason for the heavy and exacting burden which is imposed upon proponents of a contract of that character to prove its existence is, as we explained in *Perez v. Potier,* supra, "Because one of the parties to the alleged contract is dead, and her version of the transaction is not available, it is of the utmost importance that the evidence in behalf of the survivor be carefully scrutinized."

The theory of plaintiff's case is that the Hawkinses, by reason of the payments made by them prior to 1927, had obtained an equitable interest in the entire title which, as of that year, entitled them to receive from the Herrmanns a deed to the whole fee. These payments made during the 17-year period from 1910 to 1927 are represented to be (1) repayment to Mrs. Herrmann of the $1,500 she invested in the lot; (2) liquidation of the $2,300 borrowed through the Ashley & Rumelin bank and in 1917 refinanced in part by the $1,750 mortgage to Noffke; (3) $1,000 which they contributed to the initial cost of the building from their

savings; and (4) $500 which they had sent from Yakima to pay for certain porch repairs. In short, the plaintiff claims that as of October 19, 1927 (the date of the deed from the Herrmanns conveying an undivided one-half interest in the property to the Hawkinses) the Hawkinses had invested $4,350 in the property and had thereby completed their part of the agreement of 1910 entitling them on demand to a deed from the Herrmanns to the entire fee; however, the plaintiff asserts that in the latter part of 1927, the parties modified their agreement of 1910 in the following particular: The Hawkinses agreed to waive their demand for a deed to the entire fee and accept a deed for the lesser estate in reliance upon the promise of the Herrmanns that the surviving Herrmann would devise the remaining one-half interest in the property to the Hawkinses as tenants by the entirety.

The defendants deny the alleged agreement of 1910 and claim that the Herrmanns paid all mortgages and taxes prior to 1927. They deny that the Hawkinses repaid the $1,500 laid out by Mrs. Herrmann to acquire the land in 1910 but admit that the Hawkinses did advance the $500 necessary to repair the porch.

Mrs. Hawkins rests her claim as to the 1910 agreement primarily upon her own memory and a few odds and ends of records preserved during the nearly 40 years which had intervened up to trial time. If we had to depend alone upon plaintiff's indefinite and vague testimony, given in a disconnected and none too clear manner, as to the 1910 agreement, we would be compelled to hold that it was insufficient to justify a conclusion that any kind of binding agreement had been made between the two families at that time, much less one of the character for which she now contends. These gaps in her own testimony she attempts to

supplement by the following exhibits: (1) a receipt
dated in 1910 acknowledging a down payment from
the Herrmanns on the purchase price of the lot; (2)
a copy of building specifications described as being
for a "Bungalow for W. E. Hawkins"; (3) the deposit
slip of the Ashley & Rumelin bank previously referred
to, showing the deposit of $2,300 to the credit of
"Herman [sic] & Hawkins Building Fund"; (4) ap-
proximately 24 receipts bearing dates of 1910 and 1911
for labor and materials going into the building; and
(5) the original $1,750 mortgage of April, 1927, in
favor of August Noffke.

■ There are no checks, receipts, memoranda or
other kinds of records to give the remotest support to
Mrs. Hawkins' claim (1) that the Hawkinses put $1,000
into the cost of building the dwelling, (2) that they
paid any part of the $2,300 said to have been borrowed
from the Ashley & Rumelin bank on the security of
a mortgage, (3) that they paid any part of the $1,750
secured from Noffke to refinance the mortgage first
given to the Ashley & Rumelin bank, or (4) that they
ever paid any taxes or assessments prior to 1927.
Although the Noffke mortgage was produced, no effort
was made to produce a copy of the so-called Ashley &
Rumelin mortgage, so easily accessible from the records
in the very building where the trial was had, and
which no doubt would have revealed who were the
makers of the note thereby secured. We notice, too,
that the originals of the notes secured by the two
mortgages were not placed of record. Normally, they
would be in the possession of the parties who paid
them, in this instance the Hawkinses, if plaintiff's con-
tention in this respect is to be believed. No effort
was made to account for the absence of these missing
items and without them Mrs. Hawkins' assertion con-

cerning the existence of the 1910 agreement fails for want of the degree of certainty required in matters of this kind.

Mr. Clarence Beckman, a respected member of our bar and a witness for defendants, testified that Mr. Herrmann, at their several conferences concerning the preparation and execution of the latter's will, denied in toto the claims here made by Mrs. Hawkins. According to Mr. Beckman, Mr. Herrmann reposed great faith and confidence in the husband of his stepdaughter and had, therefore, entrusted him with the supervision of the house construction and empowered him to approve all bills incurred in the house-building enterprise. This explanation, if accepted as true, would account for the character of the deposit made in the Ashley & Rumelin bank and the endorsement found on that slip, as well as the receipts for the labor and materials produced by the plaintiff.

We now give attention to the second phase of the house transactions had between the Herrmanns and the Hawkinses. We refer to plaintiff's version of the modification of the 1910 agreement. Here again we are called upon to depend primarily upon Mrs. Hawkins' memory of what was then said and done, supplemented by two exhibits, i.e., the deed of October, 1927, conveying the undivided one-half interest, and a letter from Mr. Herrmann dated December 16, 1927, addressed to Mr. and Mrs. Hawkins at Yakima where they were then living, and the testimony of some neighbors concerning conversations subsequently had by them with Mr. Herrmann to which we will later make further reference.

The appellant places great reliance upon the letter

of December 16, 1927. The part which she stresses as pertinent reads as follows:

"Dear Mayme & Harry!

"Well this time I am going to answer your last letter, so to make you see that I have not fergotten you folks alltogether. I hope by this time you are in posession of your Deed & so you will be feeling so much better, & it is better for both parties concerned, not that I did not intend the right thing by you, then if something should happen to Ma or me, this property be yours anyway * * * ."

The rest of the letter, written in a friendly vein, is relative to matters of family interest: Mr. Herrmann's more recent employment, remarks about the prospective exchange of Christmas presents in the family and holiday plans.

Before commenting on the contents of that letter, we think it is in order to here observe that by the allegations of plaintiff's complaint and statements in her briefs, the date of the letter, i.e., December 16, 1927, is arbitrarily adopted as the date of the modification of the 1910 agreement, notwithstanding that the deed referred to therein was executed *October 19, 1927,* and recorded *November 21, 1927.* The very tenor of the letter bespeaks a previous transaction between the parties and as one completely consummated before the letter was written. Indeed, as we read its second sentence above quoted, it strongly suggests to us that the making of the deed had been attended with some tensions which occasioned the writer's hope that the Hawkinses with their deed in hand would now feel "so much better" and that what had happened would prove to be better for all parties concerned.

■ Plaintiff, however, points to that part reading, "then if something should happen to Ma or me, this

property be yours anyway,'' as proof of the agreement to devise the property which she insists was a part of the modification of 1927. We find in it no evidence of an agreement to devise, made either as of the date of the letter or any prior time. It is no more than a gratuitous promise of the kind so frequently made by persons closely related or intimately attached to the promisees in terms of respect and esteem. If we would elevate such isolated statements from their status of spontaneous compliments to the dignity of binding and enforceable covenants, we would open flood gates of litigation which would involve the estate of almost every decedent. We conclude that the letter has no probative value in support of plaintiff's cause.

Mrs. Hawkins testified that following her mother's death in 1945 and shortly after she and her husband had returned to the subject property to live, ''Mr. Hawkins said [to Mr. Herrmann], 'I would like to buy your interest,' '' and that her stepfather declined to sell. Mr. Herrmann was then about 80 years of age with a consequent short life expectancy. We consider this inquiry on the part of Mr. Hawkins made at that time, 20 years after the purported promise to devise was made, persuasively cogent that Mrs. Hawkins is in error when she now represents that the so-called modification agreement of 1927 was coupled with a promise that the surviving Herrmann would convey the other half interest to the Hawkinses. No one has attempted to explain why Mr. Hawkins would attempt to purchase that which he or his wife expected to so shortly acquire through the will of Mr. Herrmann, if the Hawkinses had had a firm and binding promise from the decedent that he would devise it to them. Nor has anyone attempted to explain why the deed given in 1927 was not a deed to the entire fee with a

reservation of a life estate in the Herrmanns, if the 1927 modification of the 1910 agreement was as Mrs. Hawkins represented it to be. Such a conveyance would have been not only the usual but the simplest and most direct way to have accomplished the intent and purpose of all the parties, if such was their true intent and purpose.

We have hereinabove noted that Mrs. Hawkins marshaled to her support the testimony of five neighbors and friends, all of whom had known Mr. Herrmann in his lifetime. The tenor of their testimony was of the same general pattern, to the effect that they had heard the decedent say at various times and occasions that "the home will be Mayme's when I am gone." Not one of them testified that he had promised to devise the property to Mrs. Hawkins. The evidence in that respect has many elements in common with those found in *Losey v. O'Hair,* 160 Or 63, 75, 83 P2d 493, and which impelled the court to there say:

> "The evidence introduced as to what the decedent said he intended to do with his real property upon his death is not referable to any contract between him and the plaintiff. Nowhere in the record * * * is any statement attributed to him which could be said to indicate that there was an agreement between Barber [the decedent] and the plaintiff. In fact, the statements of some of the plaintiff's own witnesses to the effect that the decedent intended to give the property to Miss Losey because of the indifference of his own relatives to him, and his later remark that he had decided not to leave the property to her because of his difference with her father, would tend to negative the existence of any contractual obligation on his part."

In our opinion, the plaintiff has failed to prove by clear, satisfactory and convincing evidence the terms and conditions of the alleged contract made between

the Hawkinses and the Herrmanns in 1910 or the alleged modification thereof made in 1927.

Seldom are we met with a case which so cogently and convincingly demonstrates the wisdom and exemplifies the need for the rules of caution which we have been compelled to apply to the representations of plaintiff. The plaintiff has asked us to look back 40 years and recreate an oral agreement allegedly made four decades ago between her mother, her stepfather, her husband and herself and, as she claims, modified by common consent 23 years before the trial was had in this matter. In that interim, death has silenced three of the contracting parties, thus leaving us to depend upon the tenuous testimony of plaintiff's vague and uncertain memory of those remote occasions and a few pieces of paper evidencing the existence of some collateral transactions which we are told were incident to the original and modified agreements. Except for the deed, these collateral transactions are in no instance so completely reconstructed by the several piecemeal paper exhibits which plaintiff offered that we can say with certainty what any one of them were or to what degree, if any, they were connected with the agreements said to have been made between the Herrmanns and the Hawkinses while all were living.

It is perhaps enough for us to say that plaintiff has not sustained the burden which devolved upon her; but we feel that it will not be amiss to observe that gleaning what we have from the evidence before us, we are inclined to believe that had it been possible to have more completely reproduced the original Herrmann-Hawkins deal, it would have disclosed that in 1910 the parties agreed to acquire a parcel of land which they did and build a dwelling upon it for their common use on a basis whereby each family would

own a fractional part of the title corresponding to their respective cash contributions to the common enterprise, that the giving of the deed of 1927 was occasioned by a settlement and accounting then had between them when it was mutually determined that the Hawkinses had completely executed their part of the agreement and by reason thereof were entitled to a conveyance evidencing their aliquot interest in the premises, and that by their acceptance of the deed at that time the Hawkinses thereby released and fully satisfied all claims which they then had against the Herrmanns and without any continuing obligation or agreement on the part of the latter to make any testamentary disposition in their favor as to the other half of the fee.

The decree appealed from is affirmed.